THE STATE v. EARL MOORE, Appellant.—95 S. W. (2d) 1167.

Division Two, June 30, 1936.

*P. M. Marr* for appellant.

*Roy McKittrick,* Attorney General, *William W. Barnes and James L. HornBostel,* Assistant Attorneys General, for respondent.

COOLEY, C.—Appellant and one Lee Griffith were charged jointly, by information filed in the Circuit Court of Linn County at Linneus, with the crime of burglary and larceny. Appellant, whom we shall refer to as defendant, was granted a severance and was.tried alone. The jury found him guilty of burglary and not guilty of larceny, assessing his punishment for the burglary at two years' imprisonment in the penitentiary. He was sentenced accordingly and, after unavailing motion for new trial, has appealed.

The evidence was wholly circumstantial. The State's evidence tended to show the following:

Guy Johnson, the prosecuting witness, lived at the west edge of Purdin, in Linn County. He owned a farm adjoining Purdin on the west on which, about a hundred yards west of his house, he had a feed lot of three or four acres. A graveled highway runs west from Purdin along the north side of the feed lot. In the feed lot Johnson had a cattle shed and two corncribs, one of which cribs, the one here involved, was about one hundred and fifty yards from the highway. A gate opened from the feed lot onto the highway about directly north of the crib.

Defendant, a farmer, lived with his family about three and a half miles west and north, mostly west, of Purdin. As we understand the record his residence was a half or three quarters of a mile north of the graveled highway, on a public road, not surfaced, which turned off the graveled highway. His residence could be reached from Purdin by one or two other routes, one of which, as described in the evidence, was to go north from Purdin, then west and south, the respective distances not being shown. The most direct way was by the graveled highway and the north and south road above mentioned which passed his residence.

Johnson's corncrib was broken into and a quantity of shelled yellow corn was stolen therefrom on the night of May 24, 1935. The State's evidence indicates that the offense was committed in the early morning of May 25th, before daylight, as a witness, living about an eighth of a mile west of Johnson, heard an automobile pass his house about three-twenty that morning. His testimony tends to show that the car came from the west, stopped half an hour or so in the vicinity of the gate north of Johnson's crib, and then went on east.

Johnson was feeding cattle and hogs in his feed lot. When he went there to feed his stock on the morning of the 25th he discovered that the door of his crib, which he had left fastened the evening before, had been opened and some corn had been taken. The State's evidence sufficiently shows that a burglary and larceny had been committed after he left the crib the evening before. He discovered two sets of men's footprints leading from the gate at the highway to near the crib and back to the highway, and in the highway, be-

tween the edge of the gravel and the gate, the tracks of an automobile which had evidently pulled off the graveled portion of the highway and stopped at the gate. The ground there and in the feed lot was soft enough from recent rains to take and retain the impression of the automobile tires and footprints. The footprints nearest the crib had been trampled out by the stock but the evidence justifies a finding that the men who made them had gone from the gate to the crib and thence back several times. Johnson said the tracks indicated that five or six trips had been made. Another witness said that the tracks indicated at least four trips.

Johnson promptly notified the officers, who, on the 25th, went to defendant's residence, armed with a search warrant, and searched the premises. They found seven sacks of shelled yellow corn, estimated to contain ten or twelve bushels, in his smokehouse. They also took from him the shoes he was wearing,—ordinary work shoes. The shoes had composition soles, with certain described markings on the bottoms of heel and sole. Those markings are not shown to have been peculiar to that particular pair of shoes, but appear from the State's evidence as well as that of defendant, to have been made in the process of manufacture and characteristic of that make of soles and heels. The State's evidence tended to show that one set of the above-mentioned footprints had impressions that "compared" with those markings on the heels and soles of defendant's shoes, and that his shoes were placed in some of the tracks of that set of footprints and were found to fit the imprint. Soil containing one heel imprint, —but not that of the sole,—was taken up and preserved, and, together with the shoes, was introduced in evidence. There was no evidence tending to show that defendant's shoes were of an unusual size or had any markings or deformities from repairs, wear or otherwise. Without further detailing the evidence as to the footprints it may be said that the evidence would warrant a finding that one set was made by defendant's shoes or by a pair of similar size and with similar heel and sole markings. The other set of tracks was made by shoes with smooth soles.

The automobile tracks are not described as having any particular markings. They are described thus: "There was two or three different tires on this car. That is, smooth tracks and some wasn't so smooth." The witness who thus described them, the sheriff, found similar car tracks "turning off the gravel north of Purdin and turned back south . . . . and went on south and turned back west towards Mr. Moore's house." He said there is a public road that leads to Moore's house. "Q. Where were these car tracks that you found with reference to the road to Mr. Moore's house? A. The last tracks that I seen was east and a little south of Mr. Moore's house." He did not say on what road the tracks went west or on

what road he lost them. From his description it could hardly have been on the north and south road that runs from the graveled highway northward past defendant's residence, because he said he last saw them "*east* and a little bit south" of Moore's house. He did not say how far east.

Another witness testified that he saw car tracks similar to those observed at the above-mentioned gate, at the intersection of the graveled highway and the road leading north therefrom past defendant's home that had been made by a car turning east toward Purdin from said north and south road onto the graveled highway, or *vice versa*.

Defendant owned a Chevrolet coupe automobile. It was observed and examined by the officers when they searched his premises on May 25th. No evidence was offered as to the kind, or markings, if any, of its tires, or the kind of tracks they would make.

As to the corn:—Johnson testified that on April 23, 1935, he had bought from Merle Wolf a truckload of shelled corn and another truckload from Leon Smith on April 25th. Both loads were yellow corn, but that bought from Smith had a slightly darker or brighter hue than the other. It had in it some grains with a "reddish cast," and had some rat droppings in it. Both loads were placed in the same bin in his crib, the Smith corn on top. In taking out corn to feed he would scoop from the floor of the bin and the corn, rolling down, would become mixed. If the pile of corn was "dug into" from the top, not too deep,—only one kind, that containing the grains with a reddish cast and the rat droppings, would be obtained. He thought the thieves had "dug into" the pile of corn, not scooped it from the floor of the bin, because, while he had paid no attention to the appearance of the corn pile when he fed his stock on the evening of the 24th, there appeared to be a depression in the top or upper part of the pile on the morning of the 25th, as though some corn had been taken therefrom. He estimated that ten or twelve bushels had been taken but he based that estimate, according to his testimony, chiefly (if not, according to a fair construction of all his testimony, entirely); on the number of trips that had evidently been made by the thieves from the gate to the crib. He professed no knowledge or information as to the kind or size of receptacles used by the thieves in carrying away the corn.

The corn found in defendant's smokehouse had some rat droppings in it, and some of it contained grains with a "reddish cast" similar to that bought by Johnson from Smith. Samples of corn taken from Johnson's crib and from defendant's sacks were introduced in evidence. Johnson,—naturally—could and did not attempt to, positively identify the corn found in defendant's possession as his corn. He did say, "It either came out of my crib or came out of the crib

that mine came out of in Iowa.'' ''Q. If Mr. Moore bought some corn from a truck that came from Iowa and you bought some from a truck that came out of a crib in Iowa, it would look alike, wouldn't it? A. Yes, sir.''

There was a good deal of evidence relative to the identity of the corn found in defendant's possession and its resemblance to Johnson's corn. The best that can be said of it is that it showed that the alleged stolen corn ''resembled,'' as one witness put it, the corn in Johnson's crib, and that it could have been Johnson's corn.

Defendant's evidence.

On behalf of defendant Wallace Pulliam, a clerk in the shoe department of the Purdin Mercantile Company at Purdin, testified that on May 8, 1935, he sold defendant a pair of shoes exactly like those that had been taken from defendant by the officers and introduced in evidence; that the books of the company so showed; that that brand of shoes was a very common brand and had been carried in stock and sold by the Purdin Mercantile Company, at Purdin, ever since he had worked for the company,—at least five years; ''we have handled this same design on the sole, I am sure, for a year anyway;'' that for three months or so prior to May 25, 1935, said company had sold at Purdin an average of thirty to forty pairs a month of shoes with the same sole and heel design as those of defendant's shoes.

The Purdin Mercantile Company also had a store at Linneus, about five miles south of Purdin, in which O. H. Helms handled the shoe sales. Helms testified that that store carried the same brand of shoes, with the same heel and sole design, had been doing so for several years, ''as long as I can remember,'' and that prior to May 25, 1935, said store had been selling about twenty-five pairs per month of such shoes; that shoes of sizes 7, 8 and 9 of that brand have the same size of heel and that one could not tell by looking at the heel print whether the size was 7, 8 or 9,—the difference would appear in the length and width of the sole. Helms said he could not tell exactly the size of the shoes shown him (defendant's) by looking at them; that his judgment was they were size eight, but could be seven and a half or eight and a half. He said the same heel and sole design that appeared on defendant's shoes had been used on that brand of shoes for about a year.

Defendant, testifying for himself, said that on the night of May 24th he was at home all night and was not out in a car anywhere. His wife corroborated him in this. Defendant further testified that he did not know of any car having left his place that night. He testified that he had bought the corn found in his smokehouse off a truck on the 26th of April, previous, and had received from the seller a receipt for the payment. He identified the receipt, which was introduced in evidence. It showed a sale on April 26, 1935, by

C. H. Anders to defendant of eleven bushels and forty pounds of shelled corn, at $0.97, $10.83, signed C. H. Anders. Defendant testified he had met Anders, who had a truckload of corn, and whom he did not then know, near the Farmers' Exchange at Browning, about six miles north of Purdin; that he arranged to buy some corn, to be delivered to him at a place called Mark Gooch corner about two miles north of Purdin, where a dirt road turns off a graveled highway leading from Browning; that he met Anders and his associate, J. W. Hendrix, at that place with a team and wagon and there received and paid for the corn, which was weighed out on small scales, took it home and put it in his smokehouse, where the officers found it.

Anders testified that he lived at Green Castle, in Sullivan County, and was engaged in trucking corn from Iowa to Missouri and had been delivering corn in Sullivan and Linn counties for some time; that he and Hendrix were in Browning with a full truckload, and defendant came to the truck and wanted to buy ten or twelve bushels. Anders said he could not pull his full load off the graveled highway, the dirt roads being spongy, and agreed to meet defendant at the Mark Gooch corner, which he and Hendrix did, the defendant meeting them there with a team and wagon; that the corn sold to defendant and was put in sacks brought by defendant, weighed, paid for and at defendant's request he signed and gave to defendant the receipt offered in evidence; that the samples of corn shown him, which the sheriff had taken from defendant, looked like the corn he had sold to defendant. Hendrix, who was with Anders when the sale and delivery of the corn was made to defendant, gave testimony similar to that of Anders. Both testified that the corn sold to defendant had rat droppings in it and that some of it had a reddish cast.

We have mentioned that defendant had a Chevrolet coupe automobile. When the officers examined this car on May 25th they found some grains of yellow corn on the floor of the car. Defendant testified that he had bought the car, second hand, from the Chevrolet Company at Brookfield four or five weeks prior to May 25th and that the grains of corn were then in it; that the former owner had hauled corn and coal and other things in it.

In rebuttal James Cooper testified that he lived across the road and about one hundred yards from defendant's residence; that on the night of May 24th, at *half past nine* o'clock, he saw a car go south from defendant's premises; "I was fixing to go to bed and there was a car coming up in the road and waited, and a truck waiting there on the gravel." "Q. Whereabouts from the house did it pull out? A. Pulled out right south of the house. There is a main lane that comes out west and goes south. Q. Could you tell what sort of a body it had on it? Whether it was a touring car or

coupe or what? A. Ford coupe or Chevrolet. One seated car." It was dark and he could not tell who was in the car. In this connection it should be stated that there was no evidence of any truck tracks having been observed near the above-mentioned gate or in the vicinity of defendant's residence or elsewhere.

In our opinion the evidence is not sufficient to sustain the verdict. As we have said, the evidence was wholly circumstantial. In such case in order to warrant conviction the circumstances proven must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of the defendant's guilt, but must be inconsistent with every other reasonable hypothesis, including that of his innocence. [State v. Wolff, 337 Mo. 1007, 87 S. W. (2d) 436, 440, and cases cited.] The rule is well established. In the instant case three major circumstances must be relied upon, viz:—the footprints of the men who apparently committed the crime, the automobile tracks and the supposed identity of the corn found in defendant's possession with that stolen from Johnson.

Johnson did not, and obviously could not, identify the corn as his. As we have stated, the best that can be said of the testimony on this point is that it showed that said corn found in defendant's possession resembled Johnson's corn and could have been his. Defendant gave a plausible, and, if true, a reasonable and satisfactory explanation of his possession of that corn. Granting that the truth of defendant's evidence was for the jury and not to be considered in determining the question of submissibility of the case, the State's evidence fails to exclude the hypothesis that defendant may have had corn of his own similar in appearance to that of Johnson. Johnson's statement that the corn taken from defendant either came out of his crib or out of *the same* crib in Iowa was, obviously, a mere opinion or conclusion, based on similarity of appearance and, perhaps, the presence of rat droppings in the corn. Rats abound everywhere in this part of the country. That shelled corn was being trucked into Missouri from Iowa for sale is shown by Johnson's testimony. He had bought from two men, both of whom had trucked corn into Linn County from Iowa for sale, and neither, so far as the evidence shows, specifically for him. The inference is clear (without taking judicial knowledge of conditions existing at that time), that there was a shortage of corn in Linn County which was being supplied by corn brought in from Iowa. Under the circumstances, we may well say, as was said in a somewhat similar case in State v. Emry (Mo.), 18 S. W. (2d) 10, 11 [3]: "The similarity of the corn in defendant's possession to that taken from the crib is not sufficient to make a submissible case," citing 36 Corpus Juris, 907, and notes. In that case there were other circumstances tending to show the guilt of the defendant. In this case, as in the Emry case, other circumstances must be considered.

The automobile tracks do not connect defendant with the crime. They were not traced to his premises and there is no evidence as to the kind of tires that were on his car or that they would make tracks like those observed near the gate. Moreover, if defendant's car had a truck bed or rear compartment of any sort capable of holding seven sacks of corn containing a bushel and a half or so apiece the fact was not developed by the evidence. The only description of the car we find is that it was a Chevrolet coupe,—a "one seated car." It seems hardly possible that those seven sacks of corn (perhaps more,—there were two thieves) could have been transported at one time, with two men, in an ordinary coupe or one seated car.

We think, too, that the footprints referred to, taken in connection with the other circumstances shown, are not sufficient to exclude a reasonable hypothesis of defendant's innocence, and to warrant a finding of guilt beyond a reasonable doubt. Were the footprints and other allegedly incriminating circumstances unexplained we might have a different question with which to deal. But they are not unexplained. We have referred to the evidence of defendant tending to explain his possession of the corn found in his smoke-house. As to the footprints, the testimony of Pulliam and Helms, unimpeached and which can hardly be doubted, tends to show that there must have been scores of shoes worn in that community which could have made the imprints found at the scene of the crime. We are not unmindful of the rule that in determining the question of submissibility of a case the State's evidence, with such inferences favorable to the State as may legitimately be drawn from facts proved, is to be taken as true, and the evidence of the defendant contradictory thereof is to be disregarded. We do not mean to be understood as overturning or criticizing that rule. But in the instant case, recognizing the rule, we think the State's evidence fails to measure up to the equally well-established rule that where the evidence is wholly circumstantial it must exclude every reasonable hypothesis of the defendant's innocence. Applying the latter rule, the State's evidence tends to prove that the footprints in question *could* have been made,—it may even be conceded that they *may* have been made—by defendant's shoes. But there is no showing that they may not, with fair likelihood, have been made by other similar shoes. So far as the State's evidence shows, defendant's shoes were ordinary work shoes, such as may have been worn by many men in the community. There was no evidence that they were of peculiar or unusual size or shape, or that they had any markings or characteristics, such as from repairs, wear, etc., that would cause them to make imprints peculiar to that individual pair of shoes as distinguished from imprints made by other shoes with similar heel and sole design, put on the market by the same manufacturer. In

State v. Freyer, 330 Mo. 62, 48 S. W. (2d) 894, 899 [6], it is said, "Indeed, there is authority for saying the circumstance alone that a man's shoes fit certain tracks is no proof he made the tracks, where the shoes are of average size, such as are worn by a great many people of the community."

We recognized the fact that, ofttimes, crime must be proved and can only be proved by circumstantial evidence and that the probative value of such evidence should not be minimized. But we must also bear in mind that a person may not legally be convicted of crime and deprived of his liberty on mere suspicion,—even strong suspicion,—of guilt. The proof must warrant a finding of the defendant's guilt, beyond reasonable doubt, and when, as here, it is wholly circumstantial, it must exclude any reasonable hypothesis of his innocence. After careful consideration of the evidence in this case we are of the opinion that it does not measure up to these requirements.

In view of the possibility of another trial certain criticisms of some of the instructions should be noted. The instruction on alibi is criticized because, appellant claims, it assumes, instead of requiring the jury to find, that the offense charged had been committed. Without setting out or analyzing the instruction we suggest that if the case is tried again said instruction be modified so as to obviate any question of that character. The instruction as given may be subject to the criticism made,—a point we need not determine, since any such question on another trial can be easily avoided. Approved precedents for an alibi instruction can readily be found in reported cases.

Appellant complains of the refusal of his requested Instruction C, on circumstantial evidence. The court instructed on circumstantial evidence and, while appellant complains of the given instruction as "constricted" and inadequate, we would not be inclined to reverse on that ground. Appellant's requested instruction might well enough have been given, as more adequately expressing the law of circumstantial evidence applicable to the facts of the case than the one given, but for the fact that it would have required the jury to find that the defendant, "and no one else," committed the offense charged. There was evidence that two men committed the offense. If defendant was one of those men he was guilty even though another was also guilty. The requested instruction might have been confusing and misleading to the jury and was properly refused for that reason.

Appellant complains of the giving of Instruction No. 7, which reads:

" 'The court instructs the jury that it is not essential to the guilt of this defendant that he did actually take, steal and carry away

the corn from the crib of Guy Johnson. If you find from the evidence that someone broke into and entered the crib, if you find and believe said crib was broken into and entered, or that someone else took, stole and carried away the corn from said crib, and that the defendant was present for the purpose of aiding and assisting in the act, and did anything toward the taking, stealing and carrying away of said corn, or any part thereof, you will find the defendant guilty.' ''

Under the issues in this case we think this instruction was misleading and erroneous. Defendant was charged with burglary and larceny. In order to constitute burglary the breaking and entering must be with intent to steal or to commit some other crime in the building broken into. [Sec. 4048, R. S. 1929, Mo. Stat. Ann., p. 2849.] In this case there must have been an intent to steal, since there was no evidence from which any other criminal intent could be found. The jury was not required to find that the breaking and entering, if any, was done with criminal intent, but only that *someone* ''broke into and entered the crib,'' *or* (in the alternative), that someone other than defendant stole corn therefrom and that the defendant was present for the purpose of assisting ''in the act'' (which act,—the breaking or the stealing?)—and did anything toward the stealing. If the facts were so found the jury was directed to find defendant guilty, —not merely of the larceny but guilty generally, which included the burglary. The State's evidence was sufficient, if believed by the jury, to warrant the finding that whoever broke into the crib did so with intent to steal and that whoever did the breaking did the stealing also. But the State's instructions cannot *assume* the truth of the State's evidence,—in this case, that the breaking, if done, was done burglariously. If someone else first broke open the crib, defendant not being accessory thereto, and then defendant or he and another, without committing burglary, stole corn therefrom, the offense was only petit larceny, because the value of the corn stolen was under $30. The court, by another instruction, submitted the offense of petit larceny, also directed the jury that it might find defendant guilty of burglary and not guilty of larceny or guilty of larceny and not guilty of burglary, or guilty of both burglary and larceny. The jury found him guilty of burglary and affirmatively found him not guilty of grand larceny,—that is larceny committed in connection with the burglary.

The judgment of the circuit court is reversed and the cause is remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.