235 S.W.2d 379 (1951)
STATE
v.
JORDAN.
No. 41992.
Supreme Court of Missouri, Division No. 2.
January 8, 1951.
*380 Wm. Waye, Jr., St. Charles, for appellant.
J. E. Taylor, Atty. Gen., John S. Phillips, Asst. Atty. Gen., for respondent.
LEEDY, Judge.
Opal Jordan, alias Irene Smyth (to whom we shall refer as defendant), Helen Dowling and Dorothy Fleming were jointly charged in the Circuit Court of St. Charles County with the larceny of a coat, a fur scarf, stockings and other merchandise of the aggregate value of $163.70, belonging to Chester Stores, Inc. A severance was granted, and on defendant's separate trial, she was convicted and sentenced to two years' imprisonment in the state penitentiary. She appealed, but has filed no brief. We, therefore, look to the motion for new trial for her assignments of error.
The facts show that Chester Stores, Inc., own and operate a ladies' ready-to-wear store known as "Famous," located on Main Street in St. Charles. It is admitted that about midafternoon on Saturday, September 27, 1948, defendant and her two companions, Helen Dowling and Dorothy Fleming, were in that store for as much as a half an hour. Defendant bought a pair of hose, and Helen a pair of shoes. While in the store the women were observed by Ben Kleyman, the manager, to be carrying one or more cardboard boxes about the size of a coat box. He was uncertain about the exact numberone, two or three and the precise person or persons carrying them. After they left, the manager discovered that a kolinsky scarf (which had been hanging on a rod near the window) was missing, as was also a black coat. After determining that these articles had not been sold, the manager went out on the street, and ascertained that the three women were in a car parked on Main Street near the Missouri Coal and Appliance Company. George Eddens, the manager of the nearby Ozark Paint Store, had seen the women walking north together on the east side of Main Street, enroute to the parked car *381 just mentioned. He "observed that they had some cardboard boxes, a suit-type suit box and a shopping bag." Kleyman, through Eddens, caused the police to be called. The women left the car, and went into the nearby store of the Missouri Coal and Appliance Company, where they were taken into custody by the police. The police, Kleyman and Eddens found on the back seat of the parked car a lady's black coat, a kolinsky scarf, and the other articles described in the information and identified by the manager as being the property of Chester Stores, Inc. Also found in or on the back seat were three cardboard boxes (one containing a pop-up toaster; the others empty), several shopping bags, two men's suits, and other items of merchandise not here involved.
When at police headquarters the women were questioned concerning the car. They were reluctant to tell who it belonged to. When the Chief of Police stated he would have to ascertain that fact through checking the license number, Helen Dowling stated some man had given permission to use the car. She appears to have been spokesman for the group, the Chief of Police having testified that when a question would be asked, "they would all look at the other woman and expect her to answer; as a rule, she did.
"Q. Who did? A. Miss Dowling.
"Q. You propounded the question to Opal Jordan and she would look to Helen Dowling? A. That's right.
"Q. Then Helen Dowling would answer it? A. She finally came out, yes, she generally answered."
The manager fixed the value of the goods as follows: Coat, $50; scarf $69.95 or $79.95; a number of silk scarfs at $2.95 each; handbag, $5; three boxes of stockings at $1.50 per pair; three billfolds at $1 each.
Defendant was the only witness called in her behalf. Her version was that she had driven out to St. Charles that day as Helen Dowling's passenger in a `35 Oldsmobile; that by a chance meeting on the street near the Famous store, she and Helen were joined by Dorothy Fleming (with whom both were acquainted), and it was arranged, at Dorothy's request, that she might ride back to St. Louis with them; that Dorothy was carrying a box; that the three of them entered the Famous together, and then separated; that Dorothy "mosied" all around the store while witness and Helen made the individual purchases hereinabove referred to; that all three left the store together, and Dorothy inquired and was told as to the location of the car; that witness and Helen went to a restaurant or tavern for refreshments, and Dorothy ostensibly to the car; that Dorothy was gone 30 minutes or more and they waited for her at the restaurant or tavern; that when Dorothy did come to the restaurant or tavern she was carrying a suit box; that when they got ready to go home, they left the tavern, and walked to the parked car together. The following are excerpts from her testimony (on both direct and cross-examination) and, in substance, tell the rest of her story:
"Q. When you got down to the car did you find anything in the car? A. Oh, yes, I seen a lot of merchandise in the back of the seat.
"Q. Did you make inquiry about it? A. I asked where it all came from and she said it belonged to her.
"Q. Who said that? A. Miss Fleming.
"Q. Now, let me ask you this direct question: A. Yes.
"Q. Did you aid the said Dorothy Fleming in stealing any of those articles? A. Pardon ?
"Q. Did you aid Dorothy Fleming in stealing any of those articles? A. No, I never. I never seen them before I got into the machine.
"Q. Did you know that those articles had been stolen? A. No, I didn't.
"Q. Did you know that Dorothy Fleming had stolen those articles? A. No, I didn't.
"Q. Do you know that now? A. Well, I don't know if they were or not.
"Q. You didn't consent to the stealing of any such articles, aid her in the stealing of the articles, you say? A. I did not.

*382 * * * * * *
"Q. Now, when you got back to your car after you left this tavern, what did you do? A. Well, I asked where all that stuff wasthat came from that was in the machine. It wasn't in the machine when I left it.
"Q. What was said about that? A. Miss Fleming said it was her stuff.
"Q. She said it was hers? A. That's right.
"Q. Did she say where she had gotten it or anything ? A. No, she didn't.
"Q. Now, had she walked down the street with you then? A. That's right.
"Q. Well, you say when you left there at 2:30 there was nothing in the back of the car? A. No, sir, there wasn't.

* * * * * *
"A. * * * Then we got up and went to the car, which she still had this box when she came in the restaurant and tavern combined, what the name of the place is I don't know, and she came in and sat down. Then we got up all three of us and went down to the machine, and when I opened the car, that is where I seen all this stuff piled all over the seat and all over the bottom of the machine.
"Q. Now, when you got back to the machine and you saw all that stuff there, what did you do then ? A. I asked where the stuff came from.
"Q. Yes. Then what did you do? A. Why, I didn't do nothing; I didn't know what to do, and I said, `Well let's go home.' About that time, why, I heard somebody holler, and I said, `What is that?' Then Miss Fleming said, `Oh, I am going to run,' and I said, `What do you mean you are going to run?' She jumped out of the car, and naturally I jumped out, too. I didn't know what it was all about. So we went into the Coal Company. I seen the police. So when the police came in and taken us out and taken us to the station and booked us, and I didn't do no talking. I gave my right name down there.

* * * * * *
"Q. But then did Dorothy Fleming start to run away? A. No, she didn't.
"Q. What did she do? A. She walked into the Atlas Coal or what is the name of the coal company.
"Q. Missouri Coal and Appliance? A. Yes; and we walked in there with her."
Defendant's challenge of the sufficiency of the evidence is not tenable, as held under comparable facts in the companion case. See State v. Dowling, Mo. Sup., 230 S.W.2d 691, 694. The first ten grounds of the motion for new trial in this case were copied verbatim from Helen Dowling's motion. Such of those grounds as were passed on in Helen's appeal need not be re-examined or specifically noticed in this opinion because controlled by the decision in that case.
There are several assignments growing out of the question of the ownership of the property alleged to have been stolen, and some of these vary from those assigned in the Dowling case. The articles were charged in the information to have been the property of Chester Stores, Incorporated. It is claimed there was a fatal variance between this allegation and the proof. The contention arises out of the fact that in qualifying the manager of the store, he did reply (to a preliminary question) that the merchandise in the store was owned by Chester Grossberg, and that Chester Grossberg owned Chester Stores, Incorporated. However, this was clarified upon further examination, and the witness stated definitely that such merchandise was the property of Chester Stores, Incorporated, and this was repeated by him at different times in referring separately to the identification of the articles. There was, therefore, no variance. This necessarily disposes of the further contentions that there was no evidence that the property was owned by Chester Stores, Incorporated, and that the submission of that hypothesis by instruction No. 1 was erroneous because not supported by or based on the evidence in the case.
As was said in the companion case, "The jury could reasonably find from all of the facts concerning the disappearance of the goods and the activities of defendant *383 and her companions that they were acting together with a common purpose to steal them." Consequently, there was no error in admitting the suit boxes which were being carried by the women over the objection that they were not "identified as belonging to defendant." Nor do we find anything suggesting prejudice to the rights of defendant in the ruling of the court admitting in evidence the pair of shoes and sales slip therefor purchased by Helen Dowling at the Famous, which were found in the car with the property alleged to have been stolen. In any view that may be taken of the evidence, the value of the goods exceeded the sum of $30, and hence the court would not have been justified in instructing on petit larceny.
Instruction No. 2 is challenged as being "merely an abstract declaration of law, and did not in any way refer to or cover this case." Assuming that the assignment is sufficiently specific under § 4125, R.S. `39 and Mo.R.S.A., we are, nevertheless, unable to agree with the state's contention that this complaint is not an attack upon the form of the instruction, but is one going to the question of whether the evidence warranted the giving of an instruction on circumstantial evidence. The instruction informed the jury that evidence is of two kinds, direct and circumstantial, defined those terms, and concluded thus: "Crime may be proved by circumstantial evidence, as well as by direct testimony of eye witnesses, but the facts and circumstances in evidence should be consistent with each other and with the guilt of the defendant and inconsistent with any reasonable theory of defendant's innocence." We think the definitions and the principle announced in the first portion are given concrete application to the case at bar by the recitals of the latter portion, and hence not objectionable as an abstraction. It is in a form frequently approved by this court. State v. Barker, 322 Mo. 1173, 18 S.W.2d 19.
Instruction No. 3 on reasonable doubt is attacked as being "misleading and confusing and therefore erroneous and prejudicial to the rights of this defendant." The assignment does not point out in what way the instruction is confusing or misleading, and so is too general, and insufficient under § 4125, R.S. `39 and Mo.R. S.A. State v. Cooley, Mo.Sup., 221 S.W.2d 480. The assignment that defendant's refused instruction Y "properly declared the law of this case and should have been given to the jury" is likewise insufficient under § 4125, supra, as too general.
It is charged that instruction No. 6 on the credibility of witnesses did not properly tell the jury what its duty was in case they believed that any witness had sworn falsely. The objection is not well taken, as will appear from the concluding paragraph of the instruction, reading as follows: "If the jury believes any witness has wilfully and knowingly sworn falsely as to any material fact in issue, you should disregard such false testimony, and you may reject any or all of such witness' testimony." See State v. Clark, Mo.Sup., 111 S.W.2d 101, and cases therein cited.
There is nothing in the point that instruction No. 7 was erroneous because of its failure "to tell the jury that the defendant had to have the exclusive possession of the goods mentioned before she could be convicted." What was said in reference to the sufficiency of the evidence really disposes of this point. However, it may be added that, "To create an inference of guilt, the term `exclusive' does not mean that the possession must be separate from all others provided there is other evidence to connect defendant with the offense. 12 C.J.S., Burglary, § 59 subsec. b, p. 738; State v. Wyre, Mo.Sup., 87 S.W.2d 171." State v. Oliver, 355 Mo. 173, 176, 195 S.W.2d 484, 486.
We have examined the record proper and find no reversible error therein. The judgment is affirmed.
All concur.