**STATE of Missouri, Respondent,**

v.

**Benito Vincente ROSSINI, alias Benedict Bernard Hobbs, and John Thomas Ferguson, Appellants.**

**No. 51295.**

Supreme Court of Missouri,
Division No. 2.

July 10, 1967.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 11, 1967.

———◆———

Norman H. Anderson, Atty. Gen., Jefferson City, William J. Raack, Asst. Atty. Gen., St. Louis, for respondent.

P. M. Marr, Milan, for appellants.

BARRETT, Commissioner.

Benedict Bernard Hobbs, with an assumed alias of Benito Vincente Rossini because of his dislike of his father, and John Thomas Ferguson, both with prior felony convictions, have been found guilty of burglary and stealing and have been sentenced by the court to concurrently serve sentences

of 10 years' imprisonment for the burglary and 5 years for the larceny.

Upon the trial of the cause Hobbs was represented by counsel of his own choosing and when Ferguson's counsel withdrew the court appointed Hobbs' lawyer to also represent him. The lawyer defended the cause with diligence and represented the appellants up to and including the filing of motions for acquittal, a joint motion for a new trial and the filing of a notice of appeal. Since then, upon a showing of indigency, appellants have been furnished a transcript of the record as made by their trial counsel and a highly respected lawyer has been appointed to represent them in this court and he has done so with skill and diligence.

On behalf of appellants counsel urges three collateral matters: (a) he objects to Instruction 7 relating to argument of counsel, a matter not objected to and not contained in the motion for a new trial (State v. McCarthy, Mo., 336 S.W.2d 411), (b) there is an objection to argument of state's counsel and to an alleged incident between a witness and a juror but these are not reflected in the transcript, shown only by defendants' motion and in any event were in the court's discretion (State v. Turnbough, Mo., 388 S.W.2d 781) and so are not open reviewable questions here. There is also an elaborate objection to an amendment to the information but the amendment merely added the appellants' prior criminal records as second offenders (24B C.J.S. Criminal Law § 1962, p. 482; State v. Hill, Mo., 396 S.W.2d 563), all of which the appellants of necessity admitted when testifying and consequently there could be no prejudicial error in the court's permitting the amendment.

The meritorious question vigorously urged by appellants' counsel is whether from the facts and circumstances the jury could fairly and reasonably draw the inference and find as a fact that these two appellants had participated in the burglary and the larceny. In substance the claim is that there is only a series of "disconnected circumstances," entirely circumstantial and rising only to the dignity of suspicion. It is said that there is no evidence identifying appellants as persons who broke into the building, no proof they stole anything, that stolen articles and burglary equipment found in the automobile in which they were passengers did not belong to them and was not under their control, that there were no fingerprints and for all these and other reasons it is said that the conviction rests on "mere suspicion, conjecture, or mere opportunity to commit the crime" as in State v. Moore, 339 Mo. 52, 95 S.W.2d 1167; State v. Walker, Mo., 365 S.W.2d 597, and State v. Murphy, 356 Mo. 110, 201 S.W. 2d 280, and therefore it is said that the judgments should be reversed and the appellants discharged.

Specifically the charge was that in the early morning hours of June 25, 1965, four persons, William John Politte, Ted Leroy McKinney, Benito Vincente Rossini and John T. Ferguson burglarized Leo Harnsberger's "Chuck Wagon" cafe in the village of Luray (population 154) in Clark County and took $46.33 in money, cigarettes and several items of merchandise. Politte and McKinney entered pleas of guilty to the charge and were witnesses on behalf of Rossini and Ferguson and corroborated their testimony that they were asleep in the automobile from St. Louis to Memphis and knew nothing of the burglary and larceny until stopped and arrested by highway patrol officers. In brief the background insofar as all these people are concerned is that four days prior to June 25th at least two of these people, Ferguson and McKinney, had been in St. Joseph (Ferguson's home), however, Politte said, "We had brought him up to St. Louis about 4 or 5 days before, I believe, from St. Joseph to find a job." McKinney said that he was in St. Joseph, they had been swimming, and when Ferguson said he needed a job McKinney volunteered that "if he wanted to go with me I could probably get him a job." (In two years in and out of St.

Louis McKinney had worked 4 or 5 weeks for Taystee Bakery and had a "part-time job with Electrolux Cleaners.") And so they were in St. Louis, no job was found for Ferguson and when it developed that Ferguson's wife in St. Joseph was unable to get his traffic court case continued it was necessary, so they all said, for him to be in St. Joseph the next morning, June 25, by 8:30 or 9:00 o'clock, as "I received a traffic ticket * * * and it was supposed to be paid the 25th, which was the next day." And, he says, although McKinney owned the Chevrolet automobile involved here, he was going to look at a 1957 "Olds" Ferguson had purchased a few days previously. The trip was decided upon on the spur of the moment at Ted's home and the four of them left St. Louis in McKinney's 1960 Impala about 8:30 or 9:00 o'clock and were stopped at 3:13 a.m., at the junction of Highways 15 and U.S. 136 near Memphis in Scotland County by a highway patrolman.

As McKinney conceded, since they were anxious to be in St. Joseph the next morning by 8:30 or 9:00 o'clock for Ferguson's benefit, it is a circumstance worthy of note that instead of driving across Missouri by two much shorter routes—Interstate 70 to the Kansas City area and then north; or, more directly, north to Hannibal from St. Louis and straight across the state on Highway 36 to St. Joseph—they were on Highway 136 at Memphis in Scotland County when arrested at approximately 3:30 in the morning, a route many miles out of the way and several hours from their stated destination.

Another and significant circumstance is the automobile, McKinney's 1960 two-door, red Impala Chevrolet. In the language of automobile buffs and "hot rodders," this automobile had been "customized," its motor revved, all the door handles, including the handle to the trunk lid, had been removed and the doors and lid could only be operated from the inside by a solenoid switch (Webster's Third International Dictionary). The switch to the trunk lid was out of order and McKinney had attached and ran a wire from the trunk latch into and through the back seat and the trunk lid could only be opened by pulling on that wire. From their arrest in June to the date of the trial in November the automobile had been held in a garage and it was stipulated that a demonstration on that date "would not result in the trunk lid popping up or flying open in the manner that some of the witnesses (I think) testified to." However, the highway patrolman who made the arrest testified that the trunk "could not be opened from the outside." And he said that after obtaining a search warrant "I reached in and pulled that wire and that trunk lid flew open. * * * It flew open and stayed up." After the patrolman signaled and the red Impala pulled off the road and stopped the driver, McKinney, walked back to the patrol car. The patrolman shined his flashlight into the front seat and there was one person there, Rossini, and in the back seat "crouched down" were two more, Politte and Ferguson. In the automobile officers found the cigar box, containing $46.33, from the Chuck Wagon Cafe, also a number of other items, including a badminton set. Also from between the seats there was a crowbar with green paint on it, screwdrivers and nine canvas gloves. Ferguson told the officers, he says because of his past criminal record, that his real name was "Robert Eugene Jones."

As stated, Politte and McKinney admit the burglary and larceny of two places of business in the village of Luray and corroborate Rossini's and Ferguson's claim that they were asleep in the automobile and had no knowledge of the burglaries and the question is whether, despite these claims, there is any evidence, direct or circumstantial (State v. Durham, 367 S.W.2d 619), from which the jury could reasonably infer and find that Ferguson and Rossini directly took part in the burglary and larceny or, overlooked by them, were present aiding and abetting by concerted action in a common purpose and were therefore likewise guilty as principals. State v.

Ramsey, Mo., 368 S.W.2d 413 l.c. 417; State v. Key, Mo., 411 S.W.2d 100, 103. Owen Hawkins operates a bus and has a garage in Luray and his residence is in the same building with his business on Route K, the main business street. The residence is a block west of the stores and between them and the garage is the city park but there is an unobstructed view across the park. Hawkins' daughter, Connie, was awakened in the early morning hours and heard an automobile pass. She looked out the door and stopped at the public well was a '60 or '61 Impala, which she recognized because her boyfriend had a '60 black Impala, stopped in front of Selway's (the other place burglarized). She awakened her father who dressed and went outside to see if anyone might be tampering with his combine. As he got to the corner of his garage the automobile started up. He said that he saw "one fellow come across the street. The trunk opened, and he threw a bag of some kind or something in there. * * * And another fellow appeared from the other side of the car." He returned to the residence, told his daughter to call the police, and got in his school bus "and the car at that time had moved on down to Harnsberger's Cafe facing west. I could just see the back end of the car. I seen movement there, people moving around." As to the trunk lid he said, "I didn't see anyone open it. * * * It just opened." He was positive that two people were out of the car in front of Selway's although he could not identify them and he was positive that the trunk lid "popped" open. But Connie remained at the door and this is her testimony (italics supplied):

"A. *I saw two people then walk to this store, and the car went on around* the block and stopped by my father's combine.

* * * * * *

"A. I seen *two people* come from—it looked like Selway's—* * * *and the two people threw something in their trunk,* and *it went on, and the two people ran alongside* the car out of my sight.

* * * * * *

"Q. Did one of these two men running alongside the car, did they open the trunk?

"A. I didn't notice them open it.

"Q. Tell the Court whether it did or did not fly open as it appeared to you without anybody opening it?

"A. Yes, it did.

"Q. After they threw this stuff in, then what happened?

"A. *Then the car went on down the road and they were running along beside the car.*

* * * * * *

"Q. How many people did you see running alongside the car?

"A. *Two people.*

"Q. Was the car in motion then?

A. Yes, sir."

On cross-examination she said that there were no other automobiles on the street, the two men outside were not pushing it, and she testified:

"Q. You say you saw the trunk fly up?

"A. Yes.

* * * * * *

"Q. You mean to say with a block and a half distance, trees and shrubbery in your way (which she denied obscured her view), that you would want to tell a jury that a trunk opened of itself?

"A. Yes, sir.

* * * * * *

"Q. Could you tell what was being put in the trunk?

"A. Each of them had two armloads, but I couldn't tell what it was."

In this connection, while Ferguson insisted that he was but a sleeping passenger, he knew about the "customizing" of the automobile and he knew about the trunk, he

had seen McKinney open it in St. Joseph. Rossini said that he had never seen the trunk opened and, contrary to the patrolman's testimony, he claimed that he was riding in the back seat.

■■ Thus the essence of this case is the permissible inferences from the fact that in the course of an admitted burglary and larceny, there were two people in the automobile employed in the crime and two outside—it makes no difference which two were in or out—two of them enter pleas of guilty. While two are outside throwing things in the vehicle is moving and so one of the two inside had to be driving; the trunk lid pops open and it can only be opened by means of the wire in the back seat and the other of the two inside was admittedly in the back seat and thus all four are accounted for. And all four are active in one capacity or another, one pair in breaking and entering and carrying out loot, and one in driving and operating the receptacle vehicle while the other in the back seat is pulling the wire and opening the trunk lid, the latter two if not thus actively participating as conspirators, present aiding, encouraging and abetting in concert the common purpose of a completed burglary and larceny. In addition to these telling circumstances as to Ferguson there was the incriminating circumstance of his attempt to deceive the officers as to his true name and identity. State v. Whitaker, Mo., 275 S.W.2d 322, 325. Thus in this case the "criminal agency" of the appellants is not based on mere opportunity and suspicion as in State v. Walker, Mo., 365 S.W.2d 1. c. 602, State v. Murphy, 356 Mo. 110, 201 S.W.2d 280, 282, and State v. Moore, supra. Here active conduct on the part of all those present is a permissibly fair inference from the circumstances. Here as in State v. Jordan, Mo., 235 S.W.2d 379, and its companion case, State v. Dowling, 360 Mo. 746, 230 S.W.2d 691, 694, "[t]he jury could reasonably find from all of the facts concerning the disappearance of the goods and the activities of defendant and her companions that they were acting together with a common purpose to steal them." Or as it was said in State v. Bresse, 326 Mo. 885, 33 S.W.2d 919, 921, the evidence is sufficient to support the inference "that the stranger and defendant conspired together to steal an automobile, that the stranger stole one, and that defendant was present as an accessory aiding and abetting him." The case nearest in point in all respects but not nearly so compelling in its facts is State v. Ramsey, supra, in which the mere presence of the accused, without active participation, was noted as a factor. It was there pointed out that "aiding, abetting or encouraging the crime" could be established circumstantially and if found "'makes a defendant a principal.'" The same circumstances said to be weaknesses and to show that no case was made were pointed to there as here (but need not be enumerated) but after detailing the record the court concluded there, as it must here, that "(t)hese circumstances raised a fair and reasonable inference of *concerted* action which involved defendant either as an actual participant or as an aider and abettor in the crime; and this inference, in our opinion, was sufficient '"* * * to permit reasonable minds to believe the defendant guilty beyond a reasonable doubt,"' * * * and thus to make a submissible fact issue."

Accordingly the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.