**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Denver O'DELL, Defendant-Appellant.**

### No. 13284.

Missouri Court of Appeals,
Southern District,
Division Three.

Dec. 4, 1984.

Motion for Rehearing and to Transfer Denied Dec. 26, 1984.

Application to Transfer Denied Feb. 26, 1985.

G.H. Terando, Little, Million, Terando, Schellhammer and Associates, Inc., Poplar Bluff, for defendant-appellant.

John Ashcroft, Atty. Gen., Frank A. Rubin, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

MAUS, Judge.

Count I of the amended information in this case charged that the defendant, acting in concert with others, committed conventional murder in the second degree in that he intentionally, premeditatedly, with malice aforethought and unlawfully killed Calvin Eugene Pyatt by shooting him on April 22, 1982. Count II alleged the defendant, acting in concert with others, committed second degree felony murder in causing the death of Ruth Ann O'Dell on April 22, 1982, when he attempted to commit assault in the first degree by attempting to kill or cause serious physical injury to Calvin Eugene Pyatt by shooting him and committed this offense by means of a deadly weapon. The jury found the defendant not guilty on Count I. He was found guilty on Count II. In accordance with the verdict of the jury he was sentenced to imprisonment for 50 years.

Upon defendant's appeal, this court adopted an opinion affirming his conviction and sentence. By its order, the cause was transferred to the Supreme Court. That court has ordered the cause re-transferred to this court for re-examination in light of *State v. Babb*, 680 S.W.2d 150 (Mo. banc1984). *State v. Babb*, supra, deals with alleged jury misconduct which is asserted in only two of the defendant's many points. This court's re-examination of the cause in light of *State v. Babb*, supra, is set forth in the latter portion of this opinion dealing with those points.

■ Because of the issues involved, a detailed statement of facts is necessary. In considering the sufficiency of the evidence, however, this court must accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. *State v. Brown*, 660 S.W.2d 694 (Mo. banc 1983). The initial resume of the facts will be primarily stated in accordance with that direction. Evidence to the contrary will be interspersed where it will aid in the development of the case.

The scene of this tragedy was northeastern Carter County. Except as noted, the places involved were in and people involved lived in that community. O'Dell and Pyatt were long time acquaintances. They had been reared in Carter County. However, at the time of the death, O'Dell lived in Poplar Bluff. The two frequently drank together and occasionally fought each other. Pyatt was said to have a violent temper and on one occasion he shot his television.

Apparently, although it is not clear from the record, Gene Schmidt and Wayne Schmidt were natives of St. Louis. However, at least Wayne had lived in Carter County for a number of years. Gene Schmidt said at the time of the incident he lived in St. Louis. They were friends of O'Dell. They were also, at least at one time, apparently friends of Pyatt. However, in approximately April, 1981, Gene was in the Pyatt home and got into an argument with Pyatt's daughter's boyfriend. Pyatt told him to leave and not come back. He did not. In early 1982, O'Dell accompanied by Wayne Schmidt met Pyatt on a country road in Carter County. O'Dell and one Paul Matthews were said to be fighting. O'Dell wanted Pyatt to go with him, inferentially to accost Matthews. He said that if Pyatt did not do so, he would shoot him. He was pointing a 12-gauge shotgun at Pyatt's head at the time.

On April 9, 1982, at about 7:40 p.m. a deputy sheriff found O'Dell on the side of a road near Ellsinore. He was seriously injured and was bleeding heavily from a head wound. He told the deputy sheriff that Pyatt had done it. When asked if he wanted to sign a complaint, O'Dell replied, "Hell no, I won't sign nothing, I will take care of the matter myself."

O'Dell was taken by ambulance to a hospital in Poplar Bluff. During the trip, he told the attendant several times that he would take care of Pyatt. He added they never gave him a chance to fight back. O'Dell was hospitalized for approximately ten days.

On April 22, 1982, between 10:00 a.m. and 12:00 noon, O'Dell and his wife Ruth went into a bar two miles west of Ellsinore in Carter County. He was acquainted with the proprietor. O'Dell told the proprietor he had just been released from the hospital. He asked the proprietor if he had given the proprietor any trouble the evening of April 9, 1982. The proprietor said that he didn't know O'Dell was in the car until he was told later. He added that "Pyatt come in and got something from the liquor store and they left." O'Dell said he had been injured by Pyatt and "I am going to get my evens." Ruth O'Dell added, "When Denver gets done with his licks, I am going to put mine in." The proprietor advised him to get a warrant. O'Dell did not reply. The O'Dells stayed between 30 and 45 minutes. During that time they talked of no subject other than Pyatt and what they were going to do to him.

In the early morning of April 22, 1982, at approximately 6:00 a.m., Gene Schmidt and Wayne Schmidt, in separate cars, returned from Texas. Gene's car was steaming, so they stopped at the home of a friend, one John Clifford McDowell. The three decided to go to Van Buren for a case of beer. After they purchased the beer, they started back toward Wayne's house and stopped at a store at "21 Junction." This was between 9:00 and 9:30 a.m. At the store, Gene Schmidt called O'Dell. He stated that he talked with him at that time. Apparently, McDowell had told him of a fight between Pyatt and O'Dell and O'Dell's hospitalization.

That morning, one Cecil Million had been at the home of Ned Pyatt, brother of Calvin Eugene Pyatt. Ned returned Cecil Million to his home. On the way they stopped at the 21 Junction Store for cigarettes and gasoline and encountered Gene Schmidt. Gene Schmidt said to Ned, "Tell that brother of yours he shouldn't have whipped up on Denver O'Dell." Ned took Cecil Million home, drove to his brother's home and told Eugene Pyatt of Schmidt's remark.

After buying the beer, McDowell took the Schmidts to Wayne's home. They

drank a couple of beers and the Schmidts slept. McDowell went home. About 1:00 p.m. McDowell returned with Gene's automobile. Gene Schmidt testified Denver and Ruth O'Dell came with McDowell. McDowell, Gene Schmidt, Wayne Schmidt, Denver O'Dell and Ruth O'Dell talked at Wayne's home. The talk was said to have turned to turkey hunting. After approximately two hours, Denver O'Dell, Ruth O'Dell and Gene Schmidt left in Denver O'Dell's car. This threesome went to the Twin Pines Store. It was said for the purpose of buying turkey tags and shotgun shells. Wayne Schmidt and McDowell went to McDowell's home. Gene Schmidt said they had their own automobile, although there is no indication of whose automobile. At his home McDowell loaned Wayne a 20-gauge shotgun so he could go turkey hunting. It was said the men planned a turkey hunt for the next day.

After the 20-gauge shotgun was obtained, Denver O'Dell, Ruth O'Dell, Wayne Schmidt and Gene Schmidt left in Denver O'Dell's automobile. Wayne was driving. Gene was in the front passenger seat. Denver was in the seat behind the driver. Ruth was in the seat behind Gene. The 20-gauge shotgun was in the front seat between Wayne and Gene Schmidt. A single shot 12-gauge shotgun that belonged to Wayne Schmidt was on the floor in front of Denver O'Dell and Ruth O'Dell. Both weapons were loaded. There were also in the car two sticks; one described as a table leg and the other as a nightstick.

The group then went to the home of Ned Pyatt. There was testimony they did so because Ruth O'Dell wanted some poke to make poke salad. Someone had said that Cecil Million knew where poke could be found. McDowell said he believed that Cecil Million was at Ned Pyatt's.

Ned Pyatt came to the O'Dell car and talked with the group. He was given a beer from the trunk. He told them he had taken Cecil Million home. There was other casual conversation. He acknowledged that many people in Carter County carry guns in their automobiles and he thought nothing about the guns.

Gene Schmidt testified they drove to the Cecil Million property. Apparently there are two houses on that property separated by a distance of approximately 50 yards. Other people lived in the more distant house. Gene Schmidt and O'Dell testified they drove to the nearer house and honked. When no one appeared, they left. Cecil Million testified that he was at home that afternoon and no one came to his house.

Gene Schmidt testified that Denver O'Dell wanted to go to Eugene Pyatt's to talk to him and to see if they could find Cecil Million. It is clear from the record that before the O'Dell automobile on its third and last trip stopped at the Eugene Pyatt home, the foursome had driven by that home twice. The first time Eugene Pyatt's automobile was not at his house.

As noted, Ned Pyatt had told his brother Eugene Pyatt of Gene Schmidt's remark. Eugene Pyatt had also seen Denver O'Dell's automobile, with the horn honking, pass his home. Eugene Pyatt had taken his .30 carbine to his automobile, which was parked in front of his house. Shortly before the O'Dell automobile stopped at Eugene Pyatt's home, his son Johnny Pyatt had taken his .22 rifle and walked to a pond some distance from the house.

On the third trip past the Eugene Pyatt home, someone in the foursome saw Eugene Pyatt either in or by his automobile. There was testimony from Gene Schmidt and Denver O'Dell the O'Dell automobile went past the Eugene Pyatt home until Eugene Pyatt was observed in the road, waving for them to come back. They stopped, turned around and did so. In all events, the Denver O'Dell automobile stopped in front of the Eugene Pyatt home. Eugene Pyatt walked to the car and talked to the occupants. Gene Schmidt testified Pyatt leaned in and said concerning Denver O'Dell, I thought I killed you. O'Dell said, not yet. Pyatt said, I will cure that right now. Following whatever the conversation was, Eugene Pyatt returned to his car and got his .30 carbine. Eugene Pyatt fired

two shots from the carbine and Gene Schmidt fired two shots from the 20-gauge shotgun. Gene Schmidt testified Pyatt fired first. The testimony of the Pyatt children, hereafter noted, could be construed to cast some doubt on the subject. The nature of his wounds make it apparent Pyatt fired first. There were two carbine bullet holes in the side of the rear of the O'Dell automobile. Denver O'Dell sustained a wound in his chin and below his left arm. A bullet struck Ruth O'Dell in the back. While Gene Schmidt testified that he fired when Pyatt was running to his car, the two blasts from the shotgun struck Eugene Pyatt in the chest. Eugene Pyatt fell into the open door of his automobile where he died. The Schmidts took Denver O'Dell and Ruth O'Dell to a hospital in Ellington. Ruth O'Dell was dead on arrival.

After delivering the O'Dells to the hospital, the Schmidts left. They said they were going for beer and cigarettes. However, a short distance from the hospital they hid the 12-gauge shotgun in the woods. Gene Schmidt said they did this because they did not want the 12-gauge shotgun confiscated during turkey hunting season. About one mile south of the hospital, they were seen by a highway patrolman who had learned of the incident. The Schmidts were stopped on the shoulder of the road. They made a U-turn and drove back to the hospital. The patrolman followed them to the hospital. In talking with the patrolman, they told him the 12-gauge shotgun was hidden near the place they had been stopped. The patrolman confirmed that Gene was wearing a light colored shirt, light blue or gray.

The above resume is gleaned primarily from the testimony concerning the events of the day from Ned Pyatt, and defense witnesses Gene Schmidt and Denver O'Dell. Wayne Schmidt and John Clifford McDowell did not testify. Because of the contentions of the defendant, additional testimony of the defense witnesses should be noted. Gene Schmidt explained his morning telephone call to Denver with the following statement. "Because we had arranged—He was in Texas about a month before that and I told him if I didn't find work down there, that I was coming back to St. Louis and he said, 'When you come through, call me and let me know and I will come and show you where my house is and I want you to see my new house.' " He did admit that he had been told of O'Dell's injury at the hands of Eugene Pyatt. He explained the first two trips by the Eugene Pyatt home because it was a short cut to McDowell's house. He said on the last trip they wanted to find Clifford McDowell and to talk to Eugene Pyatt. He testified that no one ever got out of the automobile at Eugene Pyatt's.

Denver said that he did not file a complaint because even though he knew Eugene Pyatt was involved in his injury, he did not know if Pyatt actually did the damage. He wanted to talk to Eugene Pyatt. If he found out Eugene Pyatt had done the damage, he might have turned him into the law. He confirmed the interest of the group in turkey hunting and finding poke greens. Denver explained the first two trips by recounting that it was a short cut to McDowell's, it was a route where there was good hunting and a good place to stop when drinking beer. He explained that on the last trip by the Eugene Pyatt home, they did not stop, even though they saw Eugene Pyatt, because they were going too fast. He said this occurred even though they were hunting Cecil Million at the Eugene Pyatt home and wanted to talk to Eugene Pyatt.

The state also offered the testimony of John Pyatt, Julia Pyatt and Shelley Huffman, children of Eugene Pyatt. Again, because of the contentions of the defendant, their testimony will be summarized.

In general, John Pyatt testified his dad came in the house and said that Denver and Wayne had just passed. His dad was scared. John said he decided to go to the pond with his .22 rifle and shoot frogs. They left the house together. When he left the house area, his father was in the front seat of his automobile or near the

automobile. It is possible his father had his gun. As John walked to the pond, about three quarters of the way, he saw O'Dell's car coming. He kept walking but soon heard four shots. He ran back and saw a big man, 200 pounds, with a light colored shirt, outside the O'Dell automobile, "kinda" looking in Pyatt's car with his head down. From that distance he could not identify the big man. The big man turned and walked back to the O'Dell car. John fired his .22 in the air to scare them off. He first said that he could not tell the sequence of the shots he heard. Cross-examination developed inconsistencies in his testimony with respect to his prior testimony at the coroner's inquest and the preliminary hearing. He had testified the big man was wearing a white shirt. He had previously testified the shots came boom, boom and a pause and then boom boom. On cross-examination he said they came boom and a pause and then boom, boom, boom. He also said that before he walked to the pond, he was standing next to his dad. From there he could at "a long ways" see the automobile turning around. His father had his gun at that time. He also admitted he testified he didn't see his dad with the gun, it was lying on the ground beside the car. He admitted he was confused. He concluded that his testimony at the trial came the closest to being accurate or what really happened.

Julia Pyatt was in the bathroom in the Pyatt home when she heard the four shots. She previously testified the shots came "a clear shot", then three "main shots." At the trial she testified the order was a clear shot, two different shots, and a clear shot. She had said a shotgun fired first, but that wasn't true. She accounted for the changes because her heart wanted her to say it was the other way.

Shelley Pyatt Huffman was in the Pyatt house when the O'Dell automobile drove up. She looked out the bedroom window. The door on her father's automobile was open. She said the door on the O'Dell automobile on the passenger side was open. She heard her father talking jovially. She saw a man in the back seat reach down, as if to pick up a beer. She looked away. Then, she heard a shot and her father yelled, "Get out of here, you son-of-a-bitches." She said the order of the shots was boom, pause, boom, boom, boom. She said her dad was at the front door of his automobile when he was hit by one shot and then another. She added that Gene Schmidt got out of the automobile and walked over to her dad's automobile. Gene walked back, got in the O'Dell automobile and they left. She admitted that at one time she testified she heard five shots. She also said that she was not sure it was Gene Schmidt. She also admitted that she changed the color of his shirt from white to light. She concluded she was being more specific than in her previous testimony because it "became clear what happened."

The amended information charged that the defendant, acting in concert with others, committed felony murder in the second degree by causing the death of Ruth O'Dell in the attempt to perpetrate assault in the first degree by attempting to kill or cause serious physical injury to Calvin Eugene Pyatt by shooting him and by means of a deadly weapon. The defendant was convicted under an instruction which submitted his guilt of second degree felony murder by causing the death of Ruth O'Dell while committing or attempting to commit assault in the second degree on Calvin Eugene Pyatt. The instruction further declared that assault in the second degree occurs when a person attempts to cause physical injury to another person by means of a deadly weapon.

The amended information charges the underlying felony was an attempt to commit assault in the first degree. The conviction is based upon the underlying offense of an attempt to commit the felony of assault in the second degree. The defendant has not raised the sufficiency of the information to support that submission. Nevertheless, this court will examine the point under Rule 30.20.

■ Research has disclosed no direct authority on this point in this state. In gen-

eral, an information is sufficient if "it contains all the essential elements of the offense ... and clearly apprises defendant of the facts constituting the offense in order to enable him to meet the charge and to bar further prosecution." *State v. Strickland,* 609 S.W.2d 392, 395 (Mo. banc 1980). Section 556.046 in part provides:

1. A defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when

    . . . .

    (2) It is specifically denominated by statute as a lesser degree of the offense charged;

■ If the defendant had been charged and was on trial for assault in the first degree, and the evidence would support the same, the state could submit his guilt of assault in the second degree. *State v. Wilkerson,* 616 S.W.2d 829 (Mo. banc 1981); *State v. Donovan,* 631 S.W.2d 39 (Mo.1982). In this case the instruction submitted the defendant's guilt of felony murder in the second degree in the attempted commission of a felony of a lesser degree than that charged in the information. The instruction did not submit a new or distinct offense. The information gave notice of the charge of the felony murder in the second degree of Ruth O'Dell. That notice included the facts of the occurrence that resulted in her death. The information provides a basis for a bar to further prosecution for that death. *State v. Coleman,* 660 S.W.2d 201 (Mo.App.1983). The information supported the submission. Compare *State v. Holland,* 653 S.W.2d 670 (Mo. banc 1983), cert. denied, —— U.S. ——, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983); *State v. Turnbow,* 67 N.M. 241, 354 P.2d 533 (1960).

Moreover, in speaking of a similar point, it has been said:

    The third and final reason appellant's point five has no merit (assuming arguendo there was a 'variance' between the information and the verdict-directing instruction) is because the information, when compared with the instruction, did not charge a separate or distinct crime.

Such a variance is fatal only where a new and distinct offense is submitted to the jury from that which the accused was charged.... In addition, for such a 'variance' to be fatal, it must be shown it 'was material to the merits of the case and prejudicial to the defense of the defendant.'

*State v. Coleman,* supra, at p. 218 (citations omitted). The difference in the charge and submission was not material to the merits of the case nor prejudicial to the defendant.

By his first two points, in slightly different thrusts, the defendant attacks the sufficiency of the evidence. Those points can be properly considered only against a backdrop of applicable substantive law.

Section 565.003 defines felony murder in the first degree. Section 565.004 declares: "All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree." This provision has been held to include felony murder in the second degree. Felony murder in the second degree is defined as a homicide "committed in the perpetration of or attempt to perpetrate *any* felony other than the five listed in the first degree murder statute." *State v. Clark,* 652 S.W.2d 123, 127 (Mo. banc 1983). Or, stated another way, "a person can be found guilty of second-degree murder under the felony murder rule *if* the homicide occurs in the furtherance of a felony...." *State v. Mannon,* 637 S.W.2d 674, 677 (Mo. banc 1982). Also see *State v. Chambers,* 524 S.W.2d 826 (Mo. banc 1975), cert. denied, 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

■ Whether or not the felony murder doctrine should be limited to deaths directly caused by an act of a defendant is subject to divergent views. Annot., Felony Murder—Killing by Another, 56 A.L.R.3d 239 (1974). This court rejects the entreaty of the defendant that such a limitation should be applied in this case. There is no reason to so limit the responsibility of one who

chooses to commit or attempt to commit a felony such as the infliction of physical injury by a deadly weapon. It is clear that in this state the doctrine is not so limited. It extends to a death that is the proximate result of the act of the felon or felons. "The significant factor is whether the death was the natural and proximate result of the acts of the appellant or of an accomplice. Of course, an independent intervening cause might relieve appellant of criminal responsibility for the killing." *State v. Moore*, 580 S.W.2d 747, 752 (Mo. banc 1979). For example, one attempting to commit robbery is guilty of the felony murder of a bystander accidentally shot by another bystander reacting to the attempted robbery. Id. Further, a felon attempting to commit robbery is guilty of the felony murder of his co-felon shot by the intended victim. *State v. Baker*, 607 S.W.2d 153 (Mo. banc 1980).

Section 562.041 in part provides:

    1. A person is criminally responsible for the conduct of another when

    . . . .

    (2) Either before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.

Under the circumstances of this case, The Criminal Code is said to eliminate the distinction between principals and accessories. The subject is discussed in *Comment, Accomplice Liability under the 1979 Missouri Criminal Code*, 44 Mo.L.Rev. 233 (1979). *State v. Coleman*, supra. Section 562.041 has been consistently applied to the homicide offenses. *State v. Coleman*, supra. See § 556.031. In summary, "[I]t is well established in this state that any person involved in the underlying felony may be held accountable for every homicide committed in the perpetration of the felony even though the fatal act was committed by a co-felon." *State v. Moore*, supra, at p. 751. It has also been clearly held that the only intent required is the intent to partici-

pate in the felony. *State v. Clark*, supra; *State v. Boggs*, 634 S.W.2d 447 (Mo. banc 1982); *State v. O'Neal*, 618 S.W.2d 31 (Mo. 1981).

"Aiders and abetters who act with common purpose with active participants in the crime, incur criminal liability by any form of affirmative advancement of the enterprise." *State v. Gannaway*, 649 S.W.2d 235, 239 (Mo.App.1983). The circumstances sufficient to establish one is an "aider" are infinitely varied. *State v. Connor*, 651 S.W.2d 550 (Mo.App.1983). "Proof of any form of participation by defendant in the crime is enough to support a conviction . . . and his presence at the scene, his companionship and conduct before and after the offense are circumstances from which one's participation in the crime may be inferred." *State v. Lyell*, 634 S.W.2d 239, 241 (Mo.App.1982) (citation omitted). Compare *State v. Strickland*, supra; *State v. Hunter*, 619 S.W.2d 883 (Mo.App.1981).

The Criminal Code defines an attempt as: "A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense." § 564.011.1. A "substantial step" is defined as "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." § 564.011.1. Even though such a homicide is a non-code offense, these definitions are applicable in construing an attempt to commit an underlying felony in a felony murder. § 556.031.

The new statutory definition of attempt has received but little construction in this state. For the prior statutory definition see §§ 556.150 and 556.160, RSMo 1969. It is clear an attempt requires a specific intent. *State v. Gonzales*, 652 S.W.2d 719 (Mo.App.1983). However, that intent may be inferred from the circumstances. *State v. Ludwig*, 609 S.W.2d 417 (Mo.1980).

The concept of a "substantial step" is drawn from The Model Penal Code. The Comments to the draft of that Code provide a guide to its interpretation. It has

been held "that when the General Assembly enacted § 4.02(1) of the Model Penal Code as § 552.030(3)(1) of the new Missouri Act, it adopted the interpretation placed thereon in the commentary by the drafters of the model act." *State v. Anderson,* 515 S.W.2d 534, 539 (Mo. banc 1974). The Committee Comments to the 1973 Proposed Criminal Code of the State of Missouri are also another aid to the interpretation of that phrase. *State v. Olson,* 636 S.W.2d 318 (Mo. banc 1982). The latter comments state that certain acts, if strongly indicative of the actor's criminal purpose, should not be held insufficient as a matter of law. Those acts include:

(a) lying in wait, searching for or following the contemplated victim of the offense.

(b) enticing or seeking to entice the contemplated victim of the offense to go to the place contemplated for its commission.

(c) reconnoitering the place contemplated for the commission of the offense.

Comments to § 564.011. The Model Penal Code in statutory terms provides, among others, that if strongly corroborative of the actor's criminal purpose, such acts shall not be held insufficient as a matter of law. The Comments thereto include the following:

Convictions for attempt have generally been sustained where the actor was apprehended during or after reconnoitering the place contemplated for the commission of the crime. The crimes contemplated have included murder, larceny, kidnapping and burglary. However, because other factors were present in all of these cases—such as weapons or equipment, confederates or additional activities—it is difficult to affirm unqualifiedly that reconnoitering, without more, was a sufficient overt act to constitute an attempt at common law.

Model Penal Code § 5.01(2)(c), Comment, (Tentative Draft No. 10, 1960). They added: "Moreover, where other factors—such as confederates or weapons or equipment—have been present, some courts have indicated that it is enough if the actor merely sets out for the place where the crime is to be committed." Model Penal Code § 5.01, Comment (Tentative Draft No. 10, 1960).

The Comments to § 9.010 of The Proposed Criminal Code state "[t]he fact that further major steps must be taken by the actor to complete the offense attempted does not render an act insubstantial." The Committee summarized the effect of the new statutory definition of attempt as follows: "Thus subsection (1) represents a shift in the emphasis of Missouri law to the extent that conduct may suffice for an attempt though not coming as close to the actual commission of the offense as present Missouri law often requires." See Comments to § 564.011.

■ It is clear that the successful completion of a crime does not bar a conviction for an attempt to commit that crime.

Subsection (1) does away with failure as an element of attempt offenses. Present law permits a defendant charged with attempt to argue that he is innocent because he actually went through with the crime. By eliminating failure as an element of attempt, the section avoids the problem of losing a conviction on a charge of attempt when the evidence shows that the offense was completed.

§ 564.011 (Comment).

■ Even though not raised by the defendant, it is also appropriate to note that second degree assault is a class D felony. § 565.060.3. An attempt to commit a class D felony is a class A misdemeanor. § 564.011.3(4). Nonetheless, a defendant is guilty of felony murder if he causes the death of a person in attempting to commit a class D felony. *State v. Cross,* 629 S.W.2d 673 (Mo.App.1982).

In this case there was direct evidence of the following. On April 9, 1982, Pyatt severely injured O'Dell. At that time, O'Dell threatened to take care of Pyatt. Within two days after his release from the hospital, O'Dell was called by his friend Gene Schmidt. There was evidence of ill will between Gene Schmidt and Pyatt.

Gene Schmidt had been told of the beating. It was also mentioned in the telephone conversation. O'Dell then drove from his home to meet the Schmidts. During a stop along the way, both Denver O'Dell and Ruth O'Dell repeated threats against Pyatt. After drinking beer and talking with the Schmidts, the foursome armed themselves with a gun owned by Wayne Schmidt and a gun borrowed from McDowell. They drove by the Pyatt home and his automobile was not there. They then drove to the nearby home of Ned Pyatt. They again drove by the Eugene Pyatt home, honking, and saw his automobile was there. They then drove by his home the third time. When Eugene Pyatt was seen alone in the automobile or in the yard, they returned.

The jury was not required to accept the foursome's professed interest in turkey hunting and poke. The jury's inherent right to reject this testimony is supported by the fact that when first questioned by the officers, the Schmidts made no mention of turkey hunting. It is almost compelled by the transparency of the tale of hunting for Cecil Million for the purpose of locating poke. It is dispelled by the fact on the third trip, even though they were looking for Cecil Million and/or Eugene Pyatt, they drove past the Pyatt home so fast they could not stop. Had the Schmidts successfully hidden their 12-gauge shotgun, there would have been no proof of the presence of a gun other than the borrowed 20-gauge shotgun in the automobile.

■ This evidence is sufficient to permit the jury to infer and find the following. The O'Dells went to meet with their friends the Schmidts to discuss the beating of O'Dell. During the two hour conference and beer drinking, they reached a plan to reap revenge from Pyatt. The jury could find the plan was an intent to inflict physical injury upon him by means of a deadly weapon. *State v. Turner,* 623 S.W.2d 4 (Mo. banc 1981); *State v. Gonzales,* supra. They were not required to infer an intent to kill or cause serious physical injury. *State v. Ellis,* 639 S.W.2d 420 (Mo.App.1982).

The jury could further find that when they first found Eugene Pyatt was not home, they looked for him at Ned Pyatt's. When they drove by the second time they honked to lure him from the house. They drove by on their third trip, before returning, to be sure he was alone. They then returned to carry out their purpose.

O'Dell had a motive to commit the offense. He provided the automobile. O'Dell's presence in his automobile, his companionship with the Schmidts and his conduct before the offense was a sufficient basis for the jury to find he was an "aider."

When the O'Dell automobile returned on the third trip, the foursome had searched for Pyatt; by honking they enticed Pyatt from his house and they had reconnoitered the place contemplated for the commission of the offense. This was abundant evidence upon the basis of which the jury could determine the foursome had made a substantial step toward inflicting physical injury upon Eugene Pyatt by a deadly weapon. The jury could further find that at the time of, and as a direct result of, this substantial step in the commission of assault in the second degree, Eugene Pyatt fired and killed Ruth O'Dell. By their verdict, the jury found these things to be true. That determination is supported by the evidence. Within the doctrine of *State v. Baker,* supra, and *State v. Moore,* supra, the attempt of O'Dell, acting in concert with others, was the proximate cause of the death of Ruth O'Dell.

The basis for this determination is not negated because, after the attempt was made, Eugene Pyatt was killed. Nor, is it dispelled even if Johnny Pyatt may have fired his .22 from the pond. The basis for such a determination exists independent of the inconsistent testimony of the three Pyatt children. Their inconsistent testimony was directed toward the issue of self-defense.

The factual and legal basis for the jury's verdict has been aptly stated. "When a defendant deliberately engenders an affray, deliberately using therein a lethal

weapon, it must be considered to be within his intent that death should result from the affray as a natural and *probable consequence* of his acts, where the death is directly attributable to the affray and not resulting from some independent intervening cause." *State v. Moore,* supra, at p. 752.

After his first general attack on the sufficiency of the evidence, the defendant denies that it is sufficient when reviewed under the standard applicable to cases dependent upon circumstantial evidence. That standard is:

> [T]he facts and circumstances relied upon by the State to establish guilt 'must not only be consistent with each other and with the hypothesis of defendant's guilt, but they must also be inconsistent and irreconcilable with his innocence and must point so clearly and satisfactorily to his guilt as to exclude every reasonable hypothesis of innocence.'

*State v. Thomas,* 452 S.W.2d 160, 162 (Mo. 1970). The standard is stated in a condensed version in MAI–CR2d 3.42. In reference to the defendant's attack, it is significant that Notes on Use 2 to that instruction provides: "This instruction may be given even if there is some direct evidence of guilt, though it need not be given at all unless the evidence is wholly circumstantial." *State v. Huston,* 660 S.W.2d 718 (Mo.App.1983). It has been recognized that in most cases, proof of less than all of the elements may be dependent on circumstantial evidence. *State v. Jackson,* 608 S.W.2d 420 (Mo.1980). In almost every case the element of intent must be, and properly is, based upon inferences from the facts. *State v. Ludwig,* supra; *State v. Connor,* supra.

It is clearly held that "[w]here the evidence, as here, is partially direct and partially circumstantial, it is not necessary to give a circumstantial evidence instruction and *the test as to submissibility is not that of a purely circumstantial evidence case."* *State v. Baldwin,* 571 S.W.2d 236, 240 (Mo. banc 1978) (emphasis added). This rule has been recently affirmed in

*State v. Griffin,* 662 S.W.2d 854 (Mo. banc 1983).

■■■ This rule is particularly applicable to this case where there is direct evidence of virtually every facet of the defendant's guilt except the precise intent of the foursome. The oft-repeated threat of O'Dell and the scarcely veiled threat of Gene Schmidt at least in part are direct evidence of that intent. Further, even where the evidence is wholly circumstantial, evidence tending to support the verdict must be considered as true, contrary evidence disregarded and every reasonable inference in support of the verdict must be indulged. *State v. Cobb,* 444 S.W.2d 408 (Mo. banc 1969); *State v. Reed,* 453 S.W.2d 946 (Mo. 1970). Even if the circumstantial evidence standard was applicable, this court finds that the facts establishing guilt are inconsistent with any *reasonable* theory of the defendant's innocence. The defendant's two points concerning the sufficiency of the evidence are denied.

One of the defendant's following points is that the court erred in not directing his acquittal "when the perpetrator of the death was not a conspirator in the commission of the crime and the death of the decedent was not a proximate cause or result of the commission of the alleged felony." In argument he elaborates that the defendant initiated no gunfire and Pyatt was not a conspirator in the underlying felony of the shooting of Pyatt. The facts and the foregoing discussion demonstrate the point has no merit.

By his next point the defendant contends the verdict-directing instructions presented inconsistent verdict possibilities and thereby he was improperly subjected to double jeopardy by a verdict of not guilty upon Count I (conventional murder of Pyatt) and a verdict of guilty of felony murder in the second degree of Ruth O'Dell, based upon a felony that was a lesser included offense of the conventional murder. At the outset, it must be observed that the underlying felony was not an integral part of the homicide of Ruth O'Dell. Compare *State v. Cook,* 560 S.W.2d 299 (Mo.App.1977).

Nor need there be concern for the doctrine of merger of the underlying offense. Annot., Felony Murder—Included Offenses, 40 A.L.R.3d 1341 (1971).

On Count I, separate instructions submitted the guilt of the defendant of the conventional second degree murder or manslaughter of Pyatt. On Count II, the instruction submitted the defendant's guilt of the felony murder of Ruth O'Dell resulting from the defendant, acting in concert with others, committing or attempting to commit assault in the second degree on Pyatt. Each of those verdict-directing instructions contained a cross reference to an instruction on self-defense and an instruction on the defense of others.

A basic fallacy in the defendant's position is demonstrated by his statement that an acquittal upon Count I was a determination that the defendant did not commit any lesser included offense. This proposition would invalidate the entire structure of instructing down. An acquittal on a greater offense in one trial, by reason of double jeopardy, bars a subsequent prosecution for a lesser included offense in a subsequent trial. *Turner v. Arkansas*, 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972). But, the double jeopardy clause does not bar a determination of guilt of a lesser included offense in the same trial. *State v. Thompson*, 610 S.W.2d 629 (Mo.1981), cert. denied, 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 122 (1981).

It is fundamental that a defendant must have committed or attempted to commit the underlying felony to be guilty of felony murder. However, there need not be a conviction of such commission or attempt to commit as a separately charged offense. It is sufficient if there is a finding or determination of such commission or attempt. *State v. Holland,* supra; *State v. Clark,* supra; *State v. Mahaney,* 625 S.W.2d 112 (Mo. banc 1981), 25 A.L.R.4th 413. There was a rational basis upon which the jury could determine the defendant, acting in concert with others, committed or attempted to commit second degree assault even though he was found not guilty upon Count I. For example, under the instructions of the court, which are not necessarily approved, the jury could have found the defendant was justified in acting in defense of others even though he was the initial aggressor. Or, the jury could have found that the defendant had made a substantial step toward committing the felony of assault in the second degree before he became an aggressor within the meaning of the self-defense instruction. The jury did not find that the defendant did not attempt to commit assault in the second degree. It found to the contrary. For such reasons, the verdict of not guilty upon Count I was not necessarily inconsistent with the verdict of guilty upon Count II.

But, even assuming that to be true, a reversal of the judgment of conviction is not required. "An inconsistent verdict ... does not require a reversal provided there is sufficient evidence to support the jury's finding of guilt." *State v. Clemons,* 643 S.W.2d 803, 805 (Mo. banc 1983).

Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.... That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters. *Dunn v. United States,* 284 U.S. 390, 393–394, 52 S.Ct. 189, 190–191, 76 L.Ed.2d 356, 358–359 (1932). Or stated another way, "while a jury's conclusions may offend the law's penchant for consistency, inconsistent verdicts among the varied charges of a multi-count indictment are not self-vitiating." *State v. Burgin,* 654 S.W.2d 627, 629 (Mo.App.1983). Also see *State v. Thompson,* supra; *State v. McCall,* 602 S.W.2d 702 (Mo.App.1980). The defendant's position has been clearly refuted.

When a defendant is tried on a multiple count charge involving crimes with different elements, there is no requirement that the jury's verdict be logically consistent. The jury may acquit on one charge and convict on the other.... There is no reason to speculate on the

reasoning which led to the verdict in this case. It is sufficient that the evidence have [sic] supported the finding of guilt which the jury made, without regard for its verdict of acquittal.

*State v. Thompson,* supra, at p. 637 (citations omitted).

What the defendant seeks to do is to impose the doctrine of collateral estoppel against the state. That doctrine does not support his position. First, as stated, the jury did not determine the issue of an attempt to commit second degree assault in favor of the defendant. Second,

> Moreover, the whole concept of collateral estoppel is inappropriate here. That doctrine 'means simply that when a [sic] issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' ... Application requires a prior judgment which then operates to preclude relitigation in a second case. There can be no collateral estoppel by one count against another in the same law suit. In that situation, the only appropriate question is whether there can be inconsistent verdicts—a question already considered above.

1.            INSTRUCTION NO. 10

A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

> First, that on or about April 22, 1982, in the County of Carter, State of Missouri, Calvin Eugene Pyatt caused the death of Ruth Ann O'Dell by shooting her, and
> Second, that Calvin Eugene Pyatt did so while the defendant and Gene Joseph Schmidt, and Wayne Leroy Schmidt were committing or attempting to commit assault in the second degree on Calvin Eugene Pyatt,

then you are instructed that the offense of murder in the second degree in connection with assault in the second degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

> Third, that with the purpose of promoting the commission of assault in the second degree against Calvin Eugene Pyatt, the defendant

*State v. Dominique,* 619 S.W.2d 782, 786 (Mo.App.1981) (citations omitted). The defendant's third point is denied.

· The defendant's next point levels a five-prong attack at the verdict-directing instruction[1] upon Count II. A definitional instruction also submitted the statutory definition of "attempt."

The defendant's first contention is based upon the fact that the instruction in essence follows MAI–CR2d 2.12, effective January 1, 1983. He argues that this is contrary to Note on Use 2 thereto which cautions not to use that instruction in the submission of felony murder. He neglects to add that Note on Use 2 also contains the admonition "See Note on Use 8." Note 8 reflects that the cautionary direction is based upon concern for the responsibility of a felon for a felonious act of a co-felon in which the felon did not actively participate and did not contemplate. Note 8 further indicates that instructions submitting aider responsibility in felony murder must be developed upon a case-by-case basis.

Instruction 10 was developed for this case. It is not a model. It is subject to criticism in many respects. Its use is not to be commended. However, the first

> acted with, aided, or encouraged Wayne Leroy Schmidt and Gene Joseph Schmidt in committing that offense, and
> Fourth, that the defendant, Wayne Leroy Schmidt, and Gene Joseph Schmidt, were not acting in lawful self defense as submitted in Instruction No. 11, or No. 12,

then you will find the defendant guilty under Count II of murder in the second degree in connection with assault in the second degree.

Assault in the second degree occurs when a person attempts to cause physical injury to another person by means of a deadly weapon.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the propositions submitted in this instruction, you must find the defendant not guilty of that offense.

If you do find the defendant guilty under Count II of murder in the second degree in connection with assault in the second degree, you will fix his punishment at imprisonment by the Department of Corrections for a term fixed by you, but not less than ten years nor more than life imprisonment.

contention of the defendant is based upon his argument there was no evidence of his active participation in the attempted assault upon Pyatt. This is contrary to the evidence. The instruction cannot be condemned as prejudicially erroneous upon the basis of that falsely premised argument. The defendant's first contention is denied.

Three of the defendant's remaining subpoints assert similar error in that instruction.[2] Again, each of these points is based upon an argument there was no evidence that the defendant participated in, aided or encouraged an attempt to inflict physical injury upon Pyatt by a deadly weapon. The defendant's false premise demonstrates the fallaciousness of these subpoints. To the extent the instruction submitted the defendant's active participation in the attempted assault, it placed a greater burden than required upon the state. *State v. Jimmerson,* 660 S.W.2d 475 (Mo. App.1983). The instruction awkwardly, but adequately, submitted the defendant's responsibility. Compare the instructions in *State v. O'Neal,* supra, and *State v. Coleman,* supra.

■ The defendant's last sub-point is:

Further, that said instruction fails to properly instruct as to lawful self-defense as supported by the evidence.

Only by argument does he specify the alleged error. The gist of his complaint is that the instruction required the jury to find that three persons, the defendant, Wayne Schmidt and Gene Schmidt, were not acting in self-defense. This is wrong, he says, because Gene Schmidt was the only person who acted in self-defense. The argument is patently without merit. Paragraph Fourth of Instruction 10 requires the jury to find that each of the persons named was not acting in self-defense. This was not prejudicial to the defendant. Further, there was no evidence that in the attempt to commit the underlying felony of assault in the second degree, any of those persons was acting in self-defense. The reference thereto was unnecessary and the defendant could not be prejudiced by the same. The defendant has not stated any sub-point demonstrating that Instruction 10 was prejudicially erroneous and therefore his fifth point is denied.

As stated, this cause was re-transferred to this court for re-examination in light of *State v. Babb,* supra. That case deals with what is termed misconduct of a jury. In the context of this case, the subject matter could be better denominated as improper or unauthorized communication with a jury. In the event of such misconduct, the rule formerly applied in this state was as follows:

[W]e have consistently ruled, in felony cases, that if the separation or misconduct of the jury took place during the progress of the trial, the verdict will be set aside, unless the state affirmatively shows that the jurors were not subject to improper influences. But if after the case has been submitted to the jury for its determination, and before a verdict has been reached, there is an opportunity that improper influence could be used on any juror, that alone will require a new trial, even though it be shown that improper influence was not exercised.

*State v. Dodson,* 338 Mo. 846, 92 S.W.2d 614, 615 (1936).

*State v. Babb,* supra, modified the rule so stated in respect to such misconduct occurring after the case has been submitted to the jury. In such instances, the rule to be now followed is stated as follows:

---

2. B. Further, that said instruction improperly and erroneously identified the appellant as a perpetrator and active participant of the alleged felony when the only facts submitted by the state show the appellant to have no part in the commission of the underlying felony.

....

D. Further, that said instruction erroneously and improperly described and attributed ele-

ments of the offense to the appellant when the only evidence showed that those elements were exclusively contributed by a person or persons other than the appellant.

E. Further, that the use of said instruction enabled the jury to comingle the acts of the appellant and others so as to be able to attribute acts to the appellant when the evidence was exclusively that such acts were those of others.

[T]hat the stronger reasons and the weight of authority sustain the rule that, where a motion for a new trial is made on account of communications to the jury during their deliberations, there is a rebuttable legal presumption that they were prejudicial to the moving party, that this presumption may in some cases be overcome by evidence, and that where competent evidence is offered it is the duty of the trial court to hear and consider it, and that when it does so, and decides the motion thereon, its decision is discretionary, and is reviewable ... [on appeal] for abuse of discretion only.... *Chambers v. United States*, 237 F[ed.] 513, 521 (8th Cir.1916).

*State v. Babb*, supra, at 152 (citations omitted).

In this case the alleged misconduct was first reported to the court after submission. However, it is not clear if the alleged misconduct was said to have occurred before or after submission. In view of the fact that no misconduct was actually established, the ambiguity is not material.

Neither *State v. Dodson*, supra, nor *State v. Babb*, supra, deals with what is necessary to establish the presumptions therein referred to and mandate an evidentiary hearing. If such a presumption is to be raised during trial, evidence of such misconduct must be presented to the court. Of course, it is sufficient if such misconduct occurs in the presence of the court. In that event, the record should be made to reflect the incident. Or, that evidence may take the form of testimony of witnesses with personal knowledge of the incident. Or, it may come in the form of a report of an officer of the court based upon the personal knowledge of that officer. This includes counsel. *State v. Edwards*, 650 S.W.2d 655 (Mo.App.1983). A report of hearsay does not constitute such evidence. *McDonald v. State*, 597 S.W.2d 365 (Tex. Cr.App.1980), cert. denied, 449 U.S. 1010, 101 S.Ct. 564, 66 L.Ed.2d 467 (1980). "Bare assertions of counsel during the trial of the case and statements in a motion for new trial do not prove themselves." *State*

*v. Dowe*, 432 S.W.2d 272, 275 (Mo.1968). Also see *State v. Davis*, 369 S.W.2d 237 (Mo.1963); *State v. Pinkerman*, 349 S.W.2d 951 (Mo.1961).

It is important to note that evidence of such misconduct should be presented as soon as known to a defendant. *State v. McGee*, 336 Mo. 1082, 83 S.W.2d 98, 105 (1935). "Appellant's knowledge of the alleged misconduct prior to the conclusion of trial prevents its consideration when raised for the first time in the motion for new trial, even though appellant's counsel did not learn of it until after trial." *State v. Brown*, 599 S.W.2d 498, 502 (Mo. banc 1980), cert. denied, 449 U.S. 985, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980). Also see *State v. McGee*, supra.

Even if such an incident is timely presented in a motion for a new trial, and evidence of the incident is not in the record, the fact of such misconduct is not established by allegations in that motion. "Bare allegations in a new trial motion do not prove themselves...." *State v. McMillin*, 581 S.W.2d 612, 616 (Mo.App.1979). Also see *State v. McIntosh*, 333 S.W.2d 51 (Mo. 1960). Rule 29.11(f) in part provides: "When any after-trial motion, including a motion for new trial, is based on facts not appearing of record, affidavits may be filed, which affidavits shall be served with the motion." Generally, to be sufficient an affidavit must be based upon personal knowledge. "Since the only evidence of any juror misconduct is found in counsel's affidavit which is manifestly hearsay and hence not competent, the appellant's contentions are not supported by the record and the issue is not properly before this court." *State v. Cookus*, 115 Ariz. 99, 563 P.2d 898 (banc 1977).

In *People v. Pugh*, 49 Ill.App.3d 174, 7 Ill.Dec. 50, 363 N.E.2d 1212 (1977), the Illinois Court of Appeals recognized the rules enunciated in *State v. Dodson*, supra, and *State v. Babb*, supra, as expressed in *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). However, citing authorities, it held: "Similarly in our case, the affidavit is based upon hearsay

evidence and as such it need not be considered. The trial court did not err in denying the defendant's motion for an evidentiary hearing." *People v. Pugh*, supra, 7 Ill.Dec. at 57, 363 N.E.2d at 1219. Also see *Wilke v. United States*, 422 F.2d 1298 (9th Cir.1970).

The decisions in this state generally hold that fact issues not otherwise preserved in the record may be raised by a motion for a new trial only when supported by an affidavit based on personal knowledge. *State v. Batek*, 638 S.W.2d 809 (Mo.App.1982); *State v. McMillin*, supra. See also *State v. Finnell*, 280 S.W.2d 110 (Mo.1955); *State v. Cole*, 547 S.W.2d 494 (Mo.App.1977). Amplifying the rule in respect to alleged jury misconduct, it has been said:

> When a defendant moves for a new trial on the ground of misconduct of a juror which occurred during the trial, he must show affirmatively that both he and his counsel were ignorant of the misconduct until after the trial. The affidavit must be full and explicit, indicating whether he has personal knowledge of the facts, the sources of his information, and the reasons for his failure to secure the affidavits of other witnesses, if any.

*State v. Flinn*, 96 S.W.2d 506, 513 (Mo. 1936). Also see *State v. Blair*, 280 S.W.2d 687 (Mo.App.1955).

The defendant's first point that pertains to such jury misconduct and is for reconsideration is that:

> The court erred in not sustaining appellant's motion for a mistrial after the jury began deliberations and the court was presented with the names of eight persons who had observed the decedent's mother and decedent's sister speaking with one or more members of the jury during recesses and making inflammatory and prejudicial remarks in the presence of the jury.

This point has the following background. Before the case was submitted, it came to the attention of the court that the mother of Ruth O'Dell had talked with a juror. The court's interrogation of the mother and the juror revealed there was a brief conversation concerning a matter in no way related to the trial. The defendant's request for a mistrial was denied. The defendant asserts no error by reason of that denial.

After the jury had been deliberating for approximately four hours, defendant's counsel stated to the court he had been told Ruth O'Dell's mother, daughter and sister had been observed talking to one to four members of the jury. Specifically, the daughter was reported to have remarked that if the jury did nothing about it, she would. Counsel supplied the court with the names of eight persons who purportedly observed the incident, but informed the court not all of those persons were yet in the courthouse. As stated, it is not clear if that reported communication was to have occurred before or after submission. Counsel moved for a mistrial.

The trial court declined to interrupt the deliberations to inquire of the members of the jury. The court stated it would put into the record for consideration anything offered by counsel. Counsel offered nothing, even though the record shows that at least two of the named persons were believed to be in the courthouse. The court stated, "Well, we will let you put all that in the record or anything you wish to put in the record at this time and if there is a real problem, you will be given an opportunity to address the problem at the appropriate time if it develops we have one." The prosecuting attorney urged counsel for the defendant to present evidence before the verdict was returned. No evidence was offered. The court announced it could not rule upon the motion because of the lack of information. After the verdicts were returned, at the request of the defendant the jury was polled. The defendant made no further requests or offers of proof through the jury or otherwise.

The hearsay report of counsel did not, by itself, establish any necessity for a mistrial. *State v. Dowe*, supra; *State v. Pinkerman*, supra. Although urged to do so, the defendant presented no evidence to establish that necessity. Under these circumstances, the action of the court in de-

clining to declare a mistrial at that time was not an abuse of its discretion. *State v. Rojano,* 519 S.W.2d 42 (Mo.App.1975).

The defendant next contends the court erred in not holding a hearing to inquire into the alleged misconduct upon the basis of his motion for a new trial. In that motion, he essentially repeated counsel's statements at the trial. He listed the names of the eight people, but stated that by reason of their differing and widely varying residences throughout Missouri, they were not available at the time of the motion. He also added, those eight people claimed to have seen the prosecuting attorney's wife greeting and making remarks to the jurors. In the motion he prayed "the court to hold a hearing, if deemed necessary, at which the eight persons may be called to testify as to what they observed and heard." Apparently, in the nature of a warning, the defendant pointed out that the defendant and his counsel verified the motion for a new trial.

■■■ The motion amounted to no more than a verified report of hearsay. It is interesting to note the eight names supplied to the court were "Wayne L. Schmidt, Jr., Wayne L. Schmidt, Sr., Rosemary Nahodil (?), Arlon Hampton, Gene Schmidt, Gary Schmidt, Gene Crosby and Robert Townsend." The defendant offered no reason for his failure to present affidavits from those eight persons, or at least one of them. The record demonstrates at least two were his friends. At least one is shown to live in Carter County. The defendant demonstrated no effort to present the testimony of any of those eight persons. He demonstrated no effort to present the testimony or affidavit of any juror. He offered no evidence upon the hearing of the motion for a new trial. He requested a hearing "if deemed necessary." The defendant could not by such a request place upon the court the burden of producing evidence. The trial court did not abuse its discretion in "deeming" that hearsay did not establish it was obligated sua sponte to hold a hearing. *State v. Flinn,* supra; *State v. Cole,* supra; *State v. Blair,*

supra; *State v. Cookus,* supra; *People v. Pugh,* supra. The point is denied.

■■■ The defendant next contends the trial court erred in not explaining to the jury its reason for striking the testimony of two rebuttal witnesses presented by the state. The defendant denied that he had threatened to seek revenge upon Pyatt. In rebuttal, the state presented the mother and the brother of Ruth O'Dell. Each testified hearing the defendant make such a threat. The defendant moved to strike the testimony of these witnesses because they had remained in the courtroom in violation of "the rule" and it was not proper rebuttal testimony. Apparently, because the state had not given the defendant notice of these witnesses, the court did strike their testimony and instructed the jurors to disregard it. No further relief was sought. Had the trial court volunteered an explanation, the defendant would now be asserting error because the unrequested explanation undoubtedly emphasized that testimony. The relief granted was all that was requested. "Nothing is preserved for review." *State v. McIlvoy,* 629 S.W.2d 333, 340 (Mo. banc 1982).

■■■ The defendant's final point is that the term of imprisonment is too severe and the trial court erred in not imposing a lesser punishment. It is true that under The Criminal Code a trial court may sentence a defendant to a term of imprisonment less than that declared by the jury. § 557.036. Also see Rule 29.05; former § 546.430, RSMo 1969. Section 557.036 is assumed to be applicable to the non-code offense of felony murder in the second degree. The sentence is within the statutory limit. The defendant initiated a chain of events that resulted in the death of another person. *State v. Moore,* supra. Passion and prejudice do not so clearly appear from the record that this court can say the trial court abused its discretion by declining to reduce the sentence declared by the jury. *State v. Johnson,* 549 S.W.2d 348 (Mo.App. 1977). Moreover, it has been held "the apparent severity of a sentence within the limits prescribed by statute does not war-

rant an appellate court to interfere with it." *State v. Williams*, 603 S.W.2d 562, 569 (Mo.1980). The defendant's last point is denied and the judgment is affirmed.

CROW, P.J., and HOGAN and PREWITT, JJ. concur.

GREENE, J., dissents with opinion attached.

GREENE, Judge, dissenting.

Among the various findings the jury had to make to reach a conclusion of guilt On Count II was that Eugene Pyatt caused Ruth O'Dell's death by shooting her; that such occurred while defendant and the Schmidts were assaulting Pyatt without justification; that O'Dell had the express purpose of promoting the assault; and that he acted with, aided or encouraged the Schmidts (named conjunctively) in committing the assault.

No witness in this case gave direct testimony of a conscious plan to perpetrate an assault, or of defendant's purpose to join in and assist such a plan, or that one of defendant's party first made an offer of violence or otherwise took affirmative steps to inflict physical injury with a deadly weapon without benefit of justification upon Eugene Pyatt. Defense witnesses explain the weapons and their presence at the scene on an innocent basis and say that Pyatt threatened and fired first; the state's witnesses try to provide a motive giving some basis for suspecting that a planned confrontation and assault on Pyatt occurred.

Since the evidence is circumstantial, the state places strong dependence on a set of oft-repeated and commonly applied principles concerning circumstantial evidence and review of the sufficiency of such evidence. These principles include the admonition that we must consider the evidence and allowable inferences in the light most favorable to the state, disregarding contrary evidence and inferences. *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980); *State v. Overkamp*, 646 S.W.2d 733, 736[5] (Mo.1983); *State v. McGee*, 592

S.W.2d 886, 887[1] (Mo.App.1980). We are also reminded that there is no requirement that the testimony favorable to the state be free of conflict [*State v. Newberry*, 605 S.W.2d 117, 121[2] (Mo.1980)], and that the jury may believe all, some or none of a witness' testimony, even if uncontradicted. *State v. Jackson*, 608 S.W.2d 420, 421[1] (Mo.1980). In short, the determination of the credibility of the witnesses was within the peculiar province of the jury, and it was for the jury to resolve inconsistencies and determine the weight to accord to the evidence. *State v. Williams*, 652 S.W.2d 102, 111[16, 17] (Mo. banc 1983).

It is true that any fact in a criminal case may be established by circumstantial evidence. *State v. Woods*, 637 S.W.2d 113, 119[16] (Mo.App.1982); *State v. McGee*, supra, 592 S.W.2d at 887[2]. To this, we might add that the purpose and acts of a defendant which are required for liability as an aider or coparticipant may also be shown by circumstantial evidence. *State v. Rossini*, 418 S.W.2d 1, 5[5] (Mo.1967); *State v. Puckett*, 611 S.W.2d 242, 245[7] (Mo.App.1980).

It is also true that in a circumstantial evidence case such as this, the facts and circumstances relied on must be consistent with each other and with the hypothesis of guilt, be inconsistent with any reasonably theory of innocence, and, in fact, point to the conclusion of guilt so clearly as to exclude every reasonable hypothesis of innocence. *State v. Prier*, 634 S.W.2d 197, 199[1] (Mo. banc 1982); *State v. Hankins*, 642 S.W.2d 606, 614[10] (Mo.1982); *State v. Abbott*, 654 S.W.2d 260, 268[5] (Mo.App. 1983).

The state's case was submitted on the relatively light burden of that form of attempted second degree assault requiring a finding of only an attempt to inflict physical injury with a deadly weapon. § 565.-060.1(1). Therefore, it was necessary that the state present sufficient substantial evidence from which the jury could conclude beyond a reasonable doubt that defendant was a responsible participant in a plan in which it was specifically intended to inflict

physical injury on Pyatt with a deadly weapon, *and* that at least a substantial step was taken with the requisite purpose toward the commission of such offense, *and* that no justification existed for the conduct. We emphasize that a "substantial step," even though not defined for the jury, consists of conduct which is *strongly* corroborative of a *firm* purpose to complete the commission of the offense. § 564.011.-1.

After applying these guiding principles of review to the evidence in this case, I believe the jury could have found that defendant and his party associated for the purpose of engaging in some sort of confrontation with Pyatt. They could well have rejected the talk of turkey hunting and polk picking as a ruse to justify their presence in the vicinity of Eugene Pyatt's home. They may have well believed the Schmidts and O'Dells went to Pyatt's home with the purpose of assaulting him.

Our concern, however, should be directed to the more specific requirements of the underlying felony on which the murder, as submitted, depended. In *State v. Gonzales*, 652 S.W.2d 719, 722[1] (Mo.App. 1983), the following was said about the corresponding form of first degree assault, after noting the definitions of attempt and substantial step:

> "There emerges here a clear requirement that conviction of an attempt to kill or to cause serious physical injury requires proof of a very specific intent on the part of the actor to accomplish that objective. That intent has been described in various ways. The statute uses the language 'a firm purpose.' In the comments upon § 5.01 of the Model Penal Code ... (Tent.Draft No. 10, 1960), the following language is used:
>
> > As previously stated, the proposed definition of attempt follows the conventional pattern of limiting this inchoate crime to purposive conduct. In the language of the court, there must be 'intent in fact' or 'specific intent' to commit the crime allegedly attempted."

I question whether any conduct shown by the evidence here meets the requirement. I am aware that the present attempt formula relieves somewhat the formerly harsh requirement of an overt act going beyond preparation and moving directly toward consummation of the crime. *See State v. Thomas*, 438 S.W.2d 441, 446[10] (Mo.1969); *State v. Stewart*, 537 S.W.2d 579, 582[3] (Mo.App.1976); Code Comment to § 564.011. The Code Comment mentioned describes a number of acts which should not be held insufficient as a matter of law, *if* they are *strongly indicative* of the actor's criminal purpose. Included are such things as lying in wait, searching out the victim and reconnoitering the proposed scene. At the same time, it has been emphasized that such analysis of conduct depends heavily on the facts of the particular case. *State v. Gilliam*, 618 S.W.2d 733, 734 (Mo.App.1981).

Under the facts of this particular case, I do not believe the arrival on the scene of the O'Dells and their friends, even assuming a bent for some type of confrontation, could represent the completion of the underlying felony which, as charged, was assaulting Pyatt with a shotgun and, as submitted, was attempting to assault him with a shotgun.

There is not a shred of evidence in this case to show that Gene Schmidt, Denver O'Dell, or anyone else, assaulted, or attempted to assault, Eugene Pyatt with a deadly weapon before Pyatt shot and killed Ruth and wounded Denver O'Dell. In fact, the evidence strongly suggests that Eugene Pyatt, having been forewarned by his brother, Ned, of possible trouble because of the beating of Denver O'Dell, decided to do unto others before they did it to him, and was killed by Gene Schmidt in the shoot-out.

I do not believe that any reasonable trier of fact could know from the evidence what really happened at the Pyatt place without indulging in gross speculation. The facts and circumstances in evidence do not, at least to me, point to a conclusion of guilt so clearly so as to exclude every reasonable

hypothesis of the innocence of Denver O'Dell.

There was insufficient evidence to sustain the conviction, and the defendant was entitled to a judgment of acquittal. For this reason, I respectfully dissent.