**STATE of Missouri, Respondent, Division One**

v.

**Michael Ami McMILLIN, Appellant.**

**No. 10711.**

Missouri Court of Appeals, Southern District.

May 14, 1979.

John D. Ashcroft, Atty. Gen., John M. Morris, III, Asst. Atty. Gen., Jefferson City, for respondent.

Donald L. Clough, Springfield, for appellant.

TITUS, Judge.

Tried under the habitual criminal law, defendant was charged with burglary of and stealing rifles from Grant Hardware situate at the northwest corner of the intersection of east-west College Avenue and north-south Warren Street in Springfield near 10 p. m. November 24, 1976. The jury found defendant guilty of burglary and in-

nocent of stealing. Defendant's motion for a new trial was denied, he was sentenced by the court to imprisonment for a term of seven years and duly appealed.

In recasting the matter following a guilty verdict, we bear in mind (1) the evidence is to be reviewed in the light most favorable to the state, (2) the state is to be afforded the benefit of all reasonable evidentiary inferences [*State v. Wiley*, 522 S.W.2d 281, 292[19] (Mo. banc 1975)] and (3) the jury had leave to believe or disbelieve all, part or none of the testimony of any witness, including the testimony of alibi witnesses. *State v. Davis*, 556 S.W.2d 745, 747[2] (Mo.App.1977).

### The State's Evidence

On the occasion in question, Springfield detectives Lloyd (driver) and Coday (passenger) were traveling eastward on College Avenue in an unmarked police car when they espied two men standing on a sidewalk adjacent to a parked Chevrolet automobile headed south on Warren Street immediately east of Grant Hardware. The police vehicle circled the block east of the store and, with lights extinguished, stopped some distance back of the Chevrolet. Shortly after beginning their vigil, the detectives saw the two men previously seen walk around the corner to the front of the store. Moments thereafter, the detectives heard the breaking of glass. With gun drawn, Coday left the police car and ran toward the corner. Lloyd drove the police car south to the immediate rear of the Chevrolet.

Just as Coday reached the southeast corner of the hardware store he met defendant, with stolen guns in his arms, rounding the corner in the direction of the Chevrolet. Upon encountering Coday, whom he knew from high school days, defendant exclaimed, "God Damn, Coday." Detective Lloyd arrived and took charge of defendant while Coday went to the front of the store and arrested defendant's companion, John Pippin, who was then inside the establishment with a tire tool which apparently had been used to break a window to permit entry. Subsequently, defendant said to Coday: "You ain't going to believe that I was waiting on a bus." Obviously the jury didn't believe it either.

### The Defendant's Evidence

Before the just recited events, defendant pictured himself at the Downbeat Club possessed of a desire to go home but without the necessary transportation. He acquired the wanted accommodations from Pippin and they started the intended journey in Pippin's Chevrolet. However, as they neared Grant Hardware, Pippin parked his car in the previously described position with the avowed intent of committing burglary of the store. When defendant's protests proved unavailing, he crossed the street to an outside pay telephone which he used to call his friend LeRoy at the Downbeat and received assurances of a ride home. Just as defendant recrossed the street, he met Pippin laden with guns which were deposited at defendant's feet before Pippin returned to the store for additional loot. At this unfortunate moment, according to defendant, the detectives arrived and arrested him despite his self-proclaimed innocence and denial that he ever had any guns in his arms.

LeRoy corroborated defendant's claim of the telephone call to him at the Downbeat Club. But LeRoy said that when he arrived at the hardware store and saw police present, he decided it was no place for him. Therefore, he departed without making his presence known to the authorities.

Linda White, a witness for the defense, testified she was in the Shamrock Motel visiting with her brother on the night of the charged crimes. The motel was "caddy-cornered [sic] across the street" from Grant Hardware and her attention was directed thereto upon hearing "some kind of trouble or scuffle going on outside" involving a large man and "a little bitty guy." After watching the men for several minutes, Linda saw the larger man throw "up his hands and walk across the street to the phone booth." When the telephone call ostensibly had been completed, the caller returned to

the hardware store just as the smaller man came from in front of the store and threw down what he was carrying "by the car." Just as the "little one . . . went back" into the store the detectives arrived, "they were really on the spot." On cross-examination Linda asserted that she was not acquainted with defendant, but added "I have seen him somewhere, but I don't know him. I've seen him around." Also, when asked if defendant would "be the big man or the small man" Linda had seen at the hardware store, Linda answered that "[h]e would be the bigger one." Linda was additionally questioned concerning a report she had once made to the police concerning a Doberman pinscher taking from her a purse which contained her "$800.00 wedding rings." Although Linda admitted that she later retracted the story, she denied having asked the investigating officers if they knew defendant "and the Gardners and the Swearengin boys."

### The State's Rebuttal Evidence

Two Springfield detectives testified that in early April 1976 they had interrogated Linda White concerning her report that a dog had stolen her purse. The detectives recounted that Linda subsequently said she had lied about the Doberman pinscher but they recalled that in their conversations with her, she had inquired of their knowledge concerning defendant, the Gardners and the Swearengin boys.

### The Defendant's Surrebuttal Evidence

Defendant took the stand to state that at the time Linda's purse was allegedly stolen he was incarcerated in the penitentiary.

### Joint Stipulation

By agreement of the parties, the court advised the jury that it was stipulated, in effect, the defendant was in custody of the Division of Corrections on the date Linda's rings and purse were reportedly stolen.

### Opinion

Defendant's penultimate and last points relied on read: "II The Court improperly read and gave MAI–CR Instruction 1.10 to the jury over the objection of defense counsel. III The State improperly presented evidence that defendant had committed a crime other than the crime for which he was on trial. At the time of the alleged crime, defendant was incarcerated in the Missouri Penitentiary at Jefferson City, Missouri. This testimony so prejudiced the jury that it was impossible for defendant to get a fair trial. The Prosecutor either knew or should have known that the testimony and the inferences to be drawn therefrom were false."

■ As to II: Wherein and why, as required by Rule 84.04(d), V.A.M.R., the court improperly read and gave the instruction is left for us to conjecture and guess. This point, as penned, violates the rule and presents absolutely nothing for appellate review. *State v. Williams*, 554 S.W.2d 524, 536[15] (Mo.App.1977). Appellate courts are not constrained to leaf the transcript on appeal nor are they required to explore the argument portion of an appellant's brief to come by the possible intendments presented in a conclusionary and abstract fashion. *Dennis v. State*, 559 S.W.2d 84, 85[1, 2] (Mo.App.1977).

■ As to III: There was no direct state's evidence that defendant had committed a crime other than that for which he was on trial. When defendant took the stand in his own defense, he admitted to prior convictions for robbery and burglary. However, defendant's point relied on suggests that it refers to matters included in the cross-examination testimony of Linda White. While Linda's recountings suggested, in a left-handed manner, that defendant was the larger man observed at the scene of the involved crimes, she testified she was not acquainted with defendant and could not identify him as figuring in the charged situation. The proffered evidence that Linda had inquired concerning defendant in the course of the purse-snatching dog incident, was simply designed to discredit her assertions that she did not know defendant before apparently seeing him the night that

Grant Hardware was burglarized. Moreover, the stipulation, supra, fully agreed to and acquiesced in by defendant, demonstrated that he could not have been involved in the "Doberman Gang" caper as he was then safely in durance vile. But more decisive of the subject at hand is the realization that defendant did not once object to the interrogation of Linda on the subject presumably intended by his second point. Assignments of error regarding admissibility of evidence are not for consideration on appeal unless they were timely presented to the trial court when the evidence was offered. *State v. Rideeoutte*, 572 S.W.2d 877, 879[4] (Mo.App.1978); *State v. Broadnax*, 572 S.W.2d 224, 226–227[1] (Mo.App.1978); *State v. Simmons*, 500 S.W.2d 325, 328[2, 3] (Mo.App.1973). Or differently stated, alleged errors not objected to at trial are waived [*State v. Morgan*, 444 S.W.2d 490, 494[6] (Mo.1969)] and cannot be subsequently resurrected successfully in a motion for a new trial or via a point raised on appeal. *State v. Hulsey*, 557 S.W.2d 715, 718[5] (Mo. App.1977).

▆▆ Defendant's first point relied on (the one we consider last) reads: "I The verdict of the jury was clearly a compromise verdict. At the time of reading MAI–CR Instruction 1.10, ten members of the jury were convinced that the defendant was guilty of both burglary and stealing and two members of the jury were convinced he was not guilty of any offense. Approximately twenty minutes after the reading of the [hammer] instruction, ten members of the jury who had previously been convinced that defendant was guilty of burglary and stealing, decided he was only guilty of burglary and not guilty of stealing, and two members of the jury who had been convinced that he was not guilty of any offense, decided he was guilty of burglary."

The first difficulty we encounter with this point is its factual inaccuracy. After the jury had deliberated for approximately three hours it was returned to the courtroom whereupon the court stated: "Without telling us on what question or issue or issues it is, could you tell me how the jury is divided at this time, if it is divided?" The jury foreman replied: "The jury is divided, sir, ten and two." The court then inquired if any member of the jury "would want to express a view on whether you feel that with further deliberation you can arrive at a verdict." The foreman then stated: "Yes, sir, I think that with a little more time and discussion we can possibly be able to come to an agreement." Then when the court inquired of the other jurors, "would anybody take exception to that?", their acquiescence in the foreman's declaration was evidenced by their silence.

Nothing in the foregoing, or any other portion of the transcript, indicates that ten jurors were ever voting defendant guilty of both burglary and stealing while two were convinced of his innocence of any offense. Likewise, there is no basis for defendant's claim that the jurors compromised on a verdict by the ten giving up their belief that defendant was guilty of both counts and the remaining two abandoning their convictions of complete innocence. Bare allegations in a new trial motion do not prove themselves [*State v. Underwood*, 470 S.W.2d 485, 487[5] (Mo.1971), cert. denied, 405 U.S. 928, 92 S.Ct. 980, 30 L.Ed.2d 802 (1972)] and assertions made in the points relied on in a defendant's brief which are wholly unsupported by the transcript, are not to be considered on appeal. *State v. Freeman*, 489 S.W.2d 749, 753[12] (Mo.App. 1973).

Judgment affirmed.

FLANIGAN, C. J., and CAMPBELL, BARKER and HENRY, Special Judges, concur.

GREENE, J., not participating because not a member of the court when cause was submitted.