**STATE of Missouri, Respondent,**

v.

**Donald Ray ZELINGER, Appellant.**

**Donald Ray ZELINGER, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 18215, 18963.

Missouri Court of Appeals, Southern District, Division One.

April 7, 1994.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

PARRISH, Chief Judge.

Following a jury trial, Donald Ray Zelinger (defendant) was found guilty of second degree murder. § 565.021.1(1).[1] Defendant was charged as and found to be a persistent offender and sentenced to imprisonment for life without eligibility for parole for thirty years. §§ 558.016.3 and .7 and § 558.019.2, RSMo Supp.1990. Following sentencing defendant filed a Rule 29.15 motion. The motion was denied after an evidentiary hearing.

Defendant appeals the judgment and sentence in his criminal case, No. 18215, and the order denying his Rule 29.15 motion, No. 18963. The appeals were consolidated pursuant to Rule 29.15(l). This court affirms the judgment of conviction and sentence in No. 18215 and the order denying defendant's Rule 29.15 motion in No. 18963.

The victim of the offense for which defendant was convicted was Joy Smith. Ms. Smith lived at Bois D'Arc, Missouri. She had been paraplegic since July 1990 when she was injured in an automobile accident. In May 1991 Ms. Smith went to the home of Rocky Dean Proctor and Darlene Proctor in Walnut Shade, Missouri, and asked them to come to her home and take care of her. Mr. and Mrs. Proctor agreed. They intended to stay with Ms. Smith until someone else could be found to assist her. They stayed "[p]robably a couple of weeks, maybe three." Ms. Smith's sister and the sister's husband and children moved in with Ms. Smith. Mr. and Mrs. Proctor returned to their home in Walnut Shade.

**1.** References to statutes are to RSMo 1986 unless   otherwise stated.

On May 29, 1991, the Proctors returned to Bois D'Arc to pick up their dog that was still at the Smith residence. They arrived early afternoon. Ms. Smith's sister Debbie, her elderly Aunt Jane and some children were at the Smith residence celebrating the aunt's birthday.

Rocky Proctor and Darlene Proctor intended to pick up their dog and return to Walnut Shade. However, once at the Smith residence, they visited "all afternoon." While there, the Proctors, Ms. Smith and her sister drank beer, consuming "[p]robably a case," 24 cans of beer, among them. While the Proctors were there, defendant and Danny Buehle joined the group.

Rocky Proctor had known defendant for about two years. Defendant stayed with the Proctors in Walnut Shade for two or three months before the Proctors went to Bois D'Arc to assist Joy Smith. Defendant remained in the Proctors' house after they went to Bois D'Arc. Later, defendant came to Bois D'Arc.

Mr. and Mrs. Proctor were planning to leave when defendant and Danny Buehle arrived at Joy Smith's residence. Buehle wanted to celebrate his upcoming birthday. He invited the Proctors to join the celebration. They accepted. Joy Smith, Rocky Proctor, Darlene Proctor, Danny Buehle and defendant left the Smith residence to travel to a bar in Springfield. Ms. Smith and Mr. and Mrs. Proctor travelled in Smith's van. Defendant and Mr. Buehle followed in Mr. Buehle's truck. The group went to the Pink Cadillac bar arriving in the "[e]arly evening." They stayed at the bar two or three hours shooting pool and drinking beer. Mr. Proctor explained their departure.

Q. [by the assistant prosecuting attorney] And at the end of that time period you left?

A. Yes, we did.

Q. Do you know why you had to leave?

A. Yeah, we were asked to leave, too much to drink, really.

Q. And you left?

A. Yes, sir.

Joy Smith was loaded into her van in her wheelchair. Rocky Proctor, Darlene Proctor and defendant got into the van and left the bar's parking lot. Mr. Proctor drove. Defendant and Ms. Smith were in the back of the van. Mr. Proctor testified:

Q. Do you recall anything unusual happening as you were driving off?

A. Yes, I do.

Q. What would that be, sir?

A. I don't really know what they were talking about, Don and Joy, but we hadn't gone very far when she made some sort of statement about, "The thing about running around with an SOB like you is the only thing a person has to do is call the law and you'd spend the rest of your life in prison," something to that effect.

Q. Do you remember anything else happening after that statement was made, or hearing anything?

A. Yes, I do. I heard a shuffle, a shuffling like movement around real quick, shuffling. I remember wondering what was going on and pulling over, I don't remember if I stopped or not, and looking back. And Don Zelinger told me to keep driving, that—he said, "___ her," he said, "I took care of her, you know, she's nothing but a rat anyway." ...

Q. Do you recall him telling you what he had done to her?

A. It seems like he said he choked her to death.

Darlene Proctor testified that after she and the others left the Pink Cadillac bar, Joy Smith was in the back of the van with defendant; that Ms. Smith was "cussing"; that she said "something like—something to the effect that she'd see Bear [defendant's nickname] back in prison for the rest of his life." Mrs. Proctor did not recall Smith's exact words but characterized them as "something to do with—that he'd be sent back to prison for the rest of his life." She heard a "clump" and looked in the back of the van. She saw Joy Smith laying on the floor of the van, not moving. She remembers defendant saying, "I took care of it, brother."

Rocky Proctor drove back to Bois D'Arc. He and the other passengers returned to Joy

Smith's residence. Proctor left the van in the driveway at the residence. His car was there. He tried to get his wife into his car and get his dog, a six year-old bulldog that was "kind of hard to handle," and a dog chain that had been used to keep the dog at the Smith residence.

Defendant first pulled Joy Smith's van to the back of the house then returned it to the front. Rocky Proctor told defendant that he was leaving, that he was going to "get the hell out of there." Defendant told Proctor that if he was asked about Joy Smith to say she was fine the last time he saw her; that she left a bar with two people she met there. Rocky Proctor left the Smith residence in his car with Mrs. Proctor and his dog. They returned to Walnut Shade.

When the Proctors arrived at their residence in Walnut Shade, Mrs. Proctor went into the house. Mr. Proctor chained up his dog, then went inside. Rocky Proctor's two step-daughters, Stephanie and Stacey, and Stephanie's boyfriend, Jimmy Zimmerman, were there. Two grandchildren were also there. Rocky Proctor told Jimmy Zimmerman and Stephanie "more or less what had happened." He told them to stay in their room.

Later, defendant arrived at the Proctors' house in Joy Smith's van. Mr. Proctor did not recall when defendant arrived. Defendant came into the house. He told Rocky Proctor that he needed help. Defendant said he needed to do something with Joy Smith's body; that he needed time to think.

Some time after defendant arrived, Jimmy Zimmerman awakened. Rocky Proctor and Zimmerman agreed to help defendant. Proctor, Zimmerman and defendant went to the rear of the Proctors' house where defendant had unloaded the body in some weeds. The body was wrapped in a blanket. Defendant loaded the body into the van. He brought the van around the house onto the road and drove away. Proctor and Zimmerman followed in Proctor's vehicle. Both vehicles went into a wooded area near the Mark Twain National Forest. Defendant stopped, unloaded the body from the van and drug it into the forest. They then returned to the Proctors' house. Defendant left a

short time later saying he was going back to Joy Smith's house so he would be there in time to go to work.

Later that day, May 30, defendant again returned to the Proctors' house in Walnut Shade driving Joy Smith's van. Defendant said he needed tools to bury the body and needed someone to show him where the body had been left—defendant was not familiar with the roads they had travelled. Defendant obtained some tools, then left the house with Jimmy Zimmerman. Rocky Proctor testified, "Don said that he had took care of it, don't worry about it, that he took care of it." Defendant told Proctor, "Don't think of it like you knew her, think of it like I killed a rat."

Later, Rocky Proctor and Darlene Proctor moved to Taneyville. They were there for about a month, then moved to Abilene, Texas.

Joy Smith's sister, Deborah Brady, saw defendant at the Smith house cleaning out the van. Defendant told Ms. Brady that he needed to talk to her about her sister; that Joy Smith had left with some people in a blue van to go to Oklahoma or Texas. He told Ms. Brady that Smith would be back in a couple of weeks.

Later the same day, Brady returned to her sister's house. She returned to put a scroll saw she had purchased earlier that day inside a garage near her sister's residence. She found one shoe that belonged to Joy Smith in the garage. She took the shoe to her sister's bedroom and put it on a shelf in her sister's closet. The shoe was for the left foot. There was no matching shoe for the right foot in the closet. Ms. Brady observed medication in the house that her sister used regularly. She also observed that none of her sister's clothing appeared to be missing.

A Taney County, Missouri, deputy sheriff, Richard Swan, went to Texas in November 1991, to pick up defendant on a criminal charge unrelated to this appeal and return him to Missouri. While in Texas, Deputy Swan talked to Rocky Proctor about the disappearance of Joy Smith. Deputy Swan suspected that Smith had been murdered and

that it might have occurred in Taney County. Proctor told Deputy Swan what happened.

In November 1991, Jimmy Zimmerman spoke to Sergeant Bob Claypool of the Taney County Sheriff's department. Mr. Zimmerman told Sergeant Claypool where Joy Smith's body was taken. Zimmerman went with law enforcement personnel to the location. Skeletal remains were found nearby. Personal items that belonged to Joy Smith were also found.

Defendant presents four points on appeal. Two are directed to the criminal conviction and two to the denial of defendant's Rule 29.15 motion.

### No. 18215

Defendant's first point on appeal asserts the trial court committed plain error in admitting certain photographs into evidence. The photographs about which defendant complains, State's Exhibits 16A, 16B, 16C and 16D, are photographs of the skeletal parts recovered from the area where defendant left Joy Smith's body. The photographs show the bones displayed on a gurney. The bones are on the gurney in a sequence corresponding to the body parts they supported—the skull at the top of the gurney, the bones of the torso immediately below it with the bones from the arms in their respective places, the pelvis and bones from the legs below the torso. The four pictures were taken from the four sides of the gurney, exhibit 16A taken from the top, displaying the back side of the skull; exhibit 16B from the left side of the skeletal remains; exhibit 16C from the right side of the skeletal remains; and, exhibit 16D from the foot of the gurney.

Defendant contends the photographs should not have been admitted in evidence because they "were irrelevant to any material issue and were highly prejudicial, as the photographs were cumulative, repetitious, gruesome, and unduly inflammatory." He argues, "If left uncorrected, this error will result in manifest injustice and a miscarriage of justice."

■ No objection was made to the introduction of State's Exhibits 16A, 16B, 16C and 16D. As such, defendant did not preserve the question of their admissibility for appellate review. "In order to give trial courts the opportunity to correct their own mistakes, any alleged error must be pointedly objected to at trial." *State v. English,* 795 S.W.2d 610, 612 (Mo.App.1990). "Assignments of error regarding admissibility of evidence are not for consideration on appeal unless they were timely presented to the trial court when the evidence was offered." *State v. McMillin,* 581 S.W.2d 612, 616 (Mo. App.1979).

■ Defendant is cognizant of the fact that he did not preserve the question he now presents for appellate review. He asks, therefore, that the issue be reviewed for plain error. *See* Rule 30.20. However, the issue does not qualify for plain error review. At the time the photographs were offered in evidence, defendant's trial counsel acquiesced in their admission. He announced, "No objection, Your Honor."

"The established rule in Missouri holds that stating 'no objection' when evidence is introduced constitutes an affirmative waiver of appellate review of the issue." *State v. Daly,* 798 S.W.2d 725, 729 (Mo.App.1990). "As opposed to a simple failure to object, which may warrant plain error review, a statement by defendant's counsel that there is no objection to ... a particular piece of evidence precludes a finding that the failure to object was negligent or inadvertent and renders that evidence admissible." *State v. Scott,* 858 S.W.2d 282, 285 (Mo.App.1993). Point I is denied.

■ The remaining point that relates to defendant's direct appeal is Point IV. Defendant contends the trial court erred when it gave as Instruction No. 4 the MAI–CR3d 302.04 definition of reasonable doubt. As with Point I, defendant did not preserve his allegation of error for review by this court. Defendant did not object to the giving of Instruction No. 4 at trial nor raise the issue in his motion for new trial. *See* Rule 29.-11(d).

Defendant contends the giving of Instruction No. 4 constituted plain error relying on the principles enunciated in *Cage v. Louisi-*

*ana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), in his challenge to the MAI–CR3d 302.04 definition of reasonable doubt. In *State v. Bogard,* 836 S.W.2d 87 (Mo.App. 1992), this court said:

> A challenge to the MAI–CR3d 302.04 definition of *reasonable doubt* was raised and denied by the Missouri Supreme Court in *State v. Antwine,* 743 S.W.2d 51 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), and more recently in *State v. Griffin,* 818 S.W.2d 278 (Mo. banc 1991). The defendant's point is governed by *Griffin* and *Antwine,* not by *Cage. State v. Edmonson,* 827 S.W.2d 243, 249 (Mo.App.1992); *State v. Vanzant,* 814 S.W.2d 705, 708 (Mo. App.1991).

*Id.* at 89. The holding in *Bogard* is applicable to this case. Point IV is denied.

### No. 18963

Point II is directed to the order denying defendant's Rule 29.15 motion. Defendant contends that he received ineffective assistance of counsel because his trial counsel failed to object to State's Exhibits 16A, 16B, 16C and 16D.

The trial court's findings regarding defendant's Rule 29.15 motion included that defendant did not present evidence supporting his allegation that the state used inflammatory evidence to prejudice the jury. In its conclusions of law, the trial court correctly stated the two-prong test that a movant seeking post-conviction relief must satisfy. Citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and *State v. Stepter,* 794 S.W.2d 649 (Mo. banc 1990), the trial court said, "In order to sustain a claim of ineffective assistance of counsel, a movant must prove that the performance of trial counsel was deficient by professional standards, and that he was prejudiced thereby. He must also show a *reasonable probability* that the outcome of his trial would have been different but for the professional errors."

Defendant's Rule 29.15 motion includes a heading denominated "Ineffective Assistance of Counsel By Thad Burrows Public Defender For Greene County, MO." The state-

ment, "Failed to object to immflamatory [sic] photographs shown to the jury," appears under that heading. However, this court finds no reference to photographs in the transcript of the evidentiary hearing on defendant's Rule 29.15 motion. Likewise, defendant's brief does not refer to any part of the transcript where the photographs to which Point II refers were discussed.

"Appellate review of a motion court's action is limited to a determination of the findings and conclusions of whether the motion court are clearly erroneous." *State v. Blankenship,* 830 S.W.2d 1, 16 (Mo. banc 1992). A claim is not properly preserved for review where it is not presented to the motion court. *Amrine v. State,* 785 S.W.2d 531, 535 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990).

*State v. Raine,* 829 S.W.2d 506, 514 (Mo.App. 1992).

■ This court has seen the photographs upon which defendant predicates his claim of ineffectiveness of counsel in that they were the focus of one of the points raised in defendant's direct appeal. Defendant's brief describes the photographs as "obscene, offensive, vulgar, horrid and repulsive." In his argument directed to Point I, he contends they lacked probative value; that they "were cumulative, repetitious, gruesome, and unduly inflammatory." Albeit that this court's consideration of defendant's claimed ineffectiveness of counsel is undertaken *ex gratia* by reason of his failure to present the issue to the trial court that decided the Rule 29.15 motion, this court does not find that defendant's trial attorney was ineffective.

Other than having been identified as human bones, the photographs revealed nothing more than trial attorneys frequently display to juries in criminal and civil trials by using skeletal models. Further, this court notes that defendant claimed Joy Smith's fatal injury was caused by her having been pitched from her wheelchair as a result of Rocky Proctor's erratic driving. Defendant's trial attorney testified at the evidentiary hearing. He explained the theory of defendant's defense.

The theory was that there was an argument at the Pink Cadillac Lounge, that Mr. Proctor had been quite agitated prior to getting into the van, that he got into the front of the van in the driver's seat, Darlene in the passenger seat, Joy was in the middle in her wheelchair, the wheelchair was not secured to the floor, Joy was not secured to the wheelchair, Mr. Proctor drove off in a very erratic fashion, accelerating, stomping on the brakes, causing the rear end of the van to come up substantially out of the air.

Our theory was that Joy was thrown out of the chair and that she hit some solid piece of the van in front of the chair, causing her neck to break or whatever injury she did indeed suffer.

The photographs were examined by the pathologist who testified at defendant's criminal trial—the photographs were taken from different angles for that purpose. Based on his examination of the photographs, the pathologist testified that the bones disclosed no indication that the victim had been hit; that there was no indication of fractures or holes in the bones that should not have been there. The neck bones were missing. For that reason, the pathologist could not determine whether the victim had been strangled. The photographs were not unnecessarily cumulative nor unduly inflammatory.

■ Failure to object is a basis of finding an attorney ineffective only if a movant was denied the right to a fair trial and trial tactics fail to justify such inaction. *Downs v. State,* 789 S.W.2d 193, 196 (Mo.App.1990). This court does not so find. "Counsel is not ineffective for failing to object to admissible evidence." *State v. Twenter,* 818 S.W.2d 628, 643 (Mo. banc 1991).

The trial court's findings and conclusions with respect to the issue presented as defendant's Point II are not clearly erroneous. Point II is denied.

■ Defendant's remaining point is Point III. Defendant contends the trial court "made no finding of fact regarding [defendant's] allegation that his trial attorney was ineffective in failing to object to inflammatory photographs." Defendant contends that

he was thereby deprived of "meaningful appellate review of his Rule 29.15 motion."

■ The findings and conclusions of the trial court addressed the issues defendant presented at evidentiary hearing. A trial court does not commit error by failing to make findings and conclusions on issues not supported by evidence at the hearing on a post-conviction motion. *State v. Hamilton,* 817 S.W.2d 8, 11–12 (Mo.App.1991). The findings and conclusions enabled this court to adequately review those matters raised on appeal and to determine whether they were clearly erroneous. They were sufficient to afford defendant the opportunity for meaningful appellate review. *See State v. Rowe,* 838 S.W.2d 103, 113 (Mo.App.1992). Point III is denied.

### Dispositions of Appeals

The judgment of conviction and sentence in No. 18215 are affirmed. The order denying defendant's Rule 29.15 motion in No. 18963 is affirmed.

SHRUM and MONTGOMERY, JJ., concur.